## UNITED STATES v. GRACE EVANGELI-CAL CHURCH OF SOUTH PROVI-DENCE RIDGE.

### No. 8066.

Circuit Court of Appeals, Seventh Circuit.

Dec. 16, 1942.

Rehearing Denied Feb. 3, 1943.

Irving Shutts, of Joliet, Ill., for appellant.

Wilma C. Martin, of Washington, D. C., and J. Albert Woll, U. S. Atty., of Chicago, Ill., for appellee.

Before EVANS, SPARKS, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

This is an appeal from a judgment of the District Court entered in a condemnation proceeding instituted by the Government for procuration of title to land for the Elwood Ordnance Plant. Included in such were the church yard and church of defendant, the value of which the jury fixed at $4,840. Defendant contended there as it does here that the proper measure of compensation should have been $7,000, the amount agreed upon in a written contract between the Government and defendant.

On November 15, 1940, one Herman, representing the Government in securing the desired acreage, presented to defendant an option whereby the latter offered to sell the property to the United States for $7,000. Among the special provisions was one to pay Herman a commission of 5 per cent of the sales price as compensation to him for services rendered in procuring the sale and preparing the deed. This option was forwarded by Herman to the War Department and there accepted on November 22, 1940. On the same day, the Department notified defendant that it had elected to purchase the property in accord with the option and desired possession within 30 days. The church arranged to terminate its use of the premises, holding its last service in February, 1941. On March 1, 1941, the Government took possession and has since retained it.

On August 4, 1941, ignoring the contract, the Government filed a proceeding in condemnation and a declaration of taking. In October, defendant filed a crosspetition or counterclaim, setting up the contract, averring that it was ready, able and willing to execute and deliver proper conveyance and praying that the court order the Government to pay it, in accord with the accepted option, the agreed price of $7,000. The Government having answered the petition, the parties stipulated as to the facts. Without first entering any order upon the petition, the court set the cause for hearing to determine fair compensation. At the trial the Government introduced the testimony of one witness that the land was worth $4,840. Defendant's offer of the contract to sell for $7,000 was refused. The court directed the jury to return a verdict for $4,840 and dismissed the counterclaim, except as to the allowance of interest.

In the District Court the Government objected to introduction of the agreement upon the ground that there existed no proof of authority to act in the officer who executed it in behalf of the United States. The court sustained the objection upon this ground, saying that the United States should not be bound by contracts executed by persons other than those who are authorized to make them, and that if it appeared that the Secretary of War had authorized the agreement, that would be the "end of the case." In this court, the Government has abandoned this contention and admits that the person who signed was authorized by the Secretary of War "to enter into contracts for the purchase of lands." It relies here, for the first time, upon the claim that the agreement is void as against public policy, because it appears therefrom that the agent of the Government was to receive a commission from the vendor. This fact, it now says, made the contract invalid from its inception.

Herman had been employed by the Government as soliciting agent to procure options. He procured some 300 or more such documents from other land owners in the same territory, each of which was on a form which the Government had apparently approved and authorized him to use, identical with that executed by defendant, and containing a recital that the commission was to be paid by the vendor. It is obvious that the Government was fully aware of this provision; that it was fully advised and had apparently approved a system whereby it permitted its agent to procure options providing for payment of his commission by the vendors.

The public policy is to be found in the constitution and laws and the decisions of the courts. St. Louis Mining & M. v. Montana Mining, 171 U.S. 650, 19 S.Ct. 61, 43 L.Ed. 320. And when the court is asked to declare a contract void upon the ground that it conflicts with the public policy, to justify sustaining the defense, the line of that policy must be clear and distinct. Bank of Augusta v. Earle, 13 Pet. 519, 597, 10 L.Ed. 274. This is upon the reasoning that men shall have the utmost liberty of contracting and that their agreements, when entered into fairly and voluntarily, shall be held sacred and enforced by the courts. This freedom of contract is not to be lightly interfered with. The burden of showing illegality is upon the party asserting it and it is not sufficient merely to create confusion and suggest doubts as to its legality. Illinois Surety Co. v. O'Brien, 6 Cir., 223 F. 933.

It is well recognized that one employed as agent violates no duty to his principal by acting for another party to the transaction if he makes full disclosure of all relevant facts which the principal knows or should know, or if the principal otherwise knows of them and acquiesces in the agent's conduct. Restatement, Agency, Sections 390, 391 and 392; Williston on Contracts, Revised Edition, Vol. 5, section 1532 and cases there cited. Likewise if either principal, upon learning of the true situation, after the transaction has been thus brought about, ratifies the dual representation the transaction is no longer voidable by him. Section 1532. And unless the principal rescinds within a reasonable time after learning the true situation he is presumed to ratify. Fitzgerald v. Union Central L. Ins. Co., 8 Cir., 42 F.2d 76, certiorari denied 282 U.S. 838, 51 S.Ct. 38, 75 L.Ed. 744.

Consequently, it seems to us, there was nothing illegal in the transaction. If the agent had secretly procured commissions from the Government's adversary, a different situation would arise, but there is no federal statute or court decision forbidding the Government, if it is fully advised, from entering into such a contract, or establishing a public policy avoiding a contract generally recognized as valid,— one in which the agent fully discloses to his principal that he is receiving compensation from the adversary. In such case the principal has no cause for complaint. Cholot v. Strohm, 235 App.Div. 150, 256 N.Y.S. 647. Illegality arises from secret commissions, not from those known to both parties. Freedom of contract is to be preserved and where, as here, the procedure, if not instituted or suggested by the Government, was at least carried to a conclusion with its knowledge and acquiescence, it may not complain.

The United States insists further that the consideration mentioned in the contract was arrived at by including improper items. However, there is no evidence in the record to substantiate this assertion. In view of our conclusions, if this claim has any proper place in the hearing, it may be given consideration in the District Court.

The judgment will be reversed with directions to proceed in accord with the announcements herein.

EVANS, Circuit Judge (dissenting).

Convinced that the agency contract between Herman and Col. Valliant, of the Quartermaster Corps of the United States Army, was against public policy, I believe the District Court correctly denied appellant's right to recover more than the fair market value of the property.

It would seem elementary that if an employment contract was against public policy, the agent named therein was without authority to bind his principal, the United States Government. Equally clear is the proposition that land purchase contracts which are against public policy, may not be enforced against the United States, regardless of any attempted ratification by any public official. Wisconsin Central R. Co. v. United States, 164 U.S. 210, 212, 17 S.Ct. 45, 41 L.Ed. 399. Good faith by the ratifying official is inconsequential.

Liability in this case must finally turn on the authority of Herman to bind the United States by the contract which he and the landowner entered into. This contract, like hundreds of others with this agent, provided that "the vendor agrees to pay * * * Herman, of Chicago, Illinois, a commission of 5% of the gross sales price." In other words, Herman was acting for the United States Government, but was paid by the vendor. His compensation was a percentage of the purchase price, which was fixed by him and the vendor.

Reduced to its last analysis, the validity of the sales contract depends on the ethics (the anti-public policy standard) of an

agency contract which empowered the agent to buy land for the U. S. Government at prices fixed by him and the landowner and out of which the landowner, not the Government, pays him five per cent. of the selling price.

Sound reason and common sense, alike, condemn this contract as violative of sound public policy. Instead of protecting the public (the Government and the taxpayers), it furnished incentive for raids upon the Treasury.

Herman was financially benefited by higher, not lower, purchase prices. Under the circumstances, the vendor was, of course, willing to pay a commission to the buyer's representative for both were interested in boosting the price. But who was there to protect the U. S. Government?

This is not like an agency contract between seller and a real estate agent where parties knew the agent was to receive a commission from the purchaser. Here, the agent had no limitation as to price. There was no one to check his price negotiations. There could be no ratification, in fact, no knowledge, of his loading the selling price to the financial advantage of himself and of the seller,

"*Public Policy*" is a somewhat relative term, perhaps a term of varying meaning. It would seem that a stricter, a higher test, is applied, and should be applied, when one of the contracting parties is the Government. It has been said that an agreement, or the contract itself, is against public policy if it has a tendency to be injurious to the public or is against the public good. State v. Gateway Mortuaries, 87 Mont. 225, 287 P. 156, 68 A.L.R. 1512; 12 Am.Juris. 663-666.

The United States Government can only act through its officers and agents. Of necessity, therefore, their authority is limited. That authority must be scrutinized carefully by all who deal with them.

It is true, the Government should be the last one to repudiate its lawful agreements of every kind. Union Pac. R. Co. v. U. S., 99 U.S. 700, 25 L.Ed. 496, 504. But action by agents of the Government which shocks the conscience, may well be condemned, on general principles, as contrary to public policy. Judicial precedent in a case on all fours with the instant action is lacking. But unaided by such decision it would seem fair to say that any act or any contract which has a tendency or is likely, to give a citizen an advantage over his Government should be voided. Marfield v. Cincinnati, D. & T. Traction Co., 111 Ohio St. 139, 144 N.E. 689, 40 A.L.R. 357.

Moreover, Congress, by Act of July 2, 1940, provided

"That the cost-plus-a-percentage-of cost system of contracting shall not be used under this section; but this proviso shall not be construed to prohibit the use of a cost-plus-a-fixed fee form of contract when such use is deemed necessary by the Secretary of War." 41 U.S.C.A. preceding § 1 note.

While this statute did not purport to define what acts or contracts were against public policy, it constituted instruction to the Government not to make contracts which from their very nature were against public interest and therefore against public policy. It was somewhat declarative of the law and furnished an explicit guide for action by the Secretary of War.

If it be contended that the Act provided a new standard of public policy and changed the law as it previously stood, then sufficient answer may be found in the fact that the passage of the Act antedated the contract in question.

It follows from what has been said that I favor the affirmance of the judgment.