**UNITED STATES v. MUSCHANY et al.**

**SAME v. ANDREWS et al.**

Nos. 12561, 12562.

Circuit Court of Appeals, Eighth Circuit.

Dec. 22, 1943.

Rehearing Denied Jan. 14, 1944.

662

Harry C. Blanton, U. S. Atty., of Sikeston, Mo., and Norman MacDonald, Atty., Department of Justice, of Washington, D. C. (Norman M. Littell, Asst. Atty. Gen., and Russell Vandivort and Drake Watson, Asst. U. S. Attys., both of St. Louis, Mo., on the brief), for appellant.

William R. Gentry, of St. Louis, Mo., for appellees James Karl Muschany and Vera Muschany.

Samuel M. Watson, of St. Louis, Mo. (Webster Karrenbrock, of St. Charles, Mo., and Redick O'Bryan, of St. Louis, Mo., on the brief), for appellees William M. Andrews and Bertha L. Andrews.

Before WOODROUGH, THOMAS, and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

The critical question is whether the contracting system used by the War Department in purchasing land for a munitions-plant site at Weldon Springs, St. Charles County, Missouri, which allowed the landowners to fix their selling price and to add five per cent thereto as compensation to the Government's optioning agent, was a "cost-plus-a-percentage-of-cost system of contracting", within the prohibition of section 1 of the National Defense Act of July 2, 1940, 54 Stat. 712, 50 U.S.C.A.Appendix, § 1171.[1]

---

[1] Section 1 of the Act provides in part that "the Secretary of War is authorized, out of the moneys appropriated for the War Department for national-defense purposes for the fiscal year ending June 30, 1941, with or without advertising. (1) to provide for the necessary construction * * * of plants, buildings, facilities, utilities, and appurtenances thereto (including Government owned facilities at privately owned plants and the expansion of such plants, and the acquisition of such land, and the purchase or lease of such structures, as may be necessary), for the * * * manufacture * * * of * * * munitions * * *; and (3)

The Secretary of War had directed the Quartermaster General to acquire the land necessary for the site, after the President had approved the Weldon Springs project. In an effort to get the job done speedily, the officer in the Quartermaster Corps to whom the task was assigned decided to avail himself of the proffered services of R. Newton McDowell, of Kansas City, Missouri, as optioning agent, for a commission of five per cent on the landowner's price, to be added into the gross figure of the submitted option. The record is conclusive that, while McDowell's written proposal, which the Quartermaster Department purported to approve and accept, recited that his compensation should consist of a five per cent commission "to be paid by the vendor", and while the purchase-option form, which the Department required McDowell to use, similarly provided that the landowner would "pay to R. Newton McDowell a commission of five per cent (5%) of the gross sales price as full payment for the services of said R. Newton McDowell in procuring such sale, preparing the deed or deeds for the conveyance of said land and arranging for settlement and closing of the transaction", the actual agreement between McDowell and the Quartermaster Department was that McDowell should obtain a price from the landowner which he would be willing to recommend to the Department for approval;[2] that the landowner should then be allowed to add an additional five per cent as compensation for McDowell; and that the total should be inserted in the option as the gross sale-price figure.[3]

---

to enter into such contracts * * * as he may deem necessary to carry out the purposes specified in this section: * * * Provided further, That the cost-plus-a-percentage-of-cost system of contracting shall not be used under this section; but this proviso shall not be construed to prohibit the use of the cost-plus-a-fixed-fee form of contract when such use is deemed necessary by the Secretary of War."

[2] Some of the transactions shown in the record (a number of which will be referred to in the opinion later) suggest that McDowell was a somewhat willing "recommender". Thus, in one case (not involving any of the appellees here), he first submitted an option, executed by an attorney in fact, for $4500, with a letter recommending "its acceptance as a fair value to the United States Government." Later, when the landowner repudiated the authority of the attorney in fact, McDowell took an option from the owner for $10,000 · and submitted it with a letter stating, "I recommend this as a fair value to the United States Government and trust you will approve same." Still later, when these discrepant recommendations had apparently created a stir in the Department, McDowell wrote another letter declaring, "In lieu of the fact that the Government will have to obtain this land through condemnation, it is our opinion that $75 per acre [a total of approximately $4,900] is a fair appraisal for this land."

[3] The Quartermaster Department apparently also had agreed that McDowell should allow the landowner to include in the option figure an additional 1½% of his net-wanted price, as a fee for the Kansas City Title Insurance Company in preparing deed, handling closing details, and issuing title certificate, and further to include the amount of the necessary revenue stamps and cost of recording the deed. McDowell's written proposal, which, as heretofore indicated, the Department had purported to approve and accept, contained a provision that McDowell would "at his [own] expense procure the services of the Kansas City Title and Insurance Company * * * to prepare certificates of title and deeds and it shall be his responsibility to see that said certificates of title and deeds are transmitted to the proper Government official for examination." The options all contained a provision that the landowner should execute and deliver a general warranty deed, "including stamps", and should "furnish, without cost to the Government, a certificate of title of the Kansas City Title Insurance Company to the said land satisfactory to the Attorney General of the United States." These inconsistencies and disguisings can hardly be commended as desirable methods of handling expenditures of public funds. The excuse made by the Quartermaster Department on the trial was its desire to get the job done as speedily as possible and "because in one single voucher we could provide for the payment of a number of different services." The result reached in the opinion requires no further pursuit here of these particular matters.

One other aspect of the general situation also perhaps bears passing mention, although it too will not be dwelt upon, since it is not controlling of the result reached. In the cases where the transaction was completed and the money paid by the Government, McDowell and the Title Insurance Company had the landowner indorse the Government's check and then deducted 5% and 1½% respec-

McDowell procured and submitted 270 options, which the Quartermaster Department approved on his recommendation,[4] without any supporting appraisal data.[5] After 129 of these transactions had been closed and conveyances of title completed— approximately $1,000,000 having been paid out in public funds—the situation appears to have been made the subject of investigation by the Department of Justice.[6] The remaining 149 contracts were thereafter repudiated by the Government, and condemnation proceedings were instituted against the landowners, declarations of taking were filed, deposits of estimated just-compensation were made, and the appointment of commissioners was requested. These estimates were materially less than the theretofore-approved contract prices, and the landowners accordingly set up the contracts as legally having fixed the measure of their compensation rights, and prayed that awards be entered for the contract amounts, without the appointment of commissioners. The Government in reply alleged that the purchase-contracts were in-

valid and renewed its demand for the appointment of commissioners to appraise the value of the property.

Because individual condemnation proceedings were instituted against the properties involved, resulting cases fell upon the dockets of all of the then-three judges for the district. One case from each judge's docket was taken as a test case, and the three judges sat together to hear the evidence and the argument as to the general invalidity of the contracts. Each judge, however, made disposition of his own case. One judge held that the purchase contract was within the congressional prohibition against any use of "the cost-plus-a-percentage-of-cost system of contracting", and hence was invalid.[7] That case is not involved in this appeal. In the other cases, each of the two judges held that the contract was not violative of the congressional prohibition, nor was it otherwise invalid, and that the landowner was accordingly entitled to have an award entered for the contract amount, without the appointment of commissioners.[8] It is these two cases

---

tively of the total option price, and not of the landowner's original wanted-price, as was the Quartermaster Department's intention. They appear to have taken the position with the landowners that this was "the letter of the bond", under the language used in the option contract. McDowell accordingly collected commissions upon his own commissions, commissions upon the Title Insurance Company's commissions, and even commissions upon the revenue stamps and recording fees. The Title Insurance Company did likewise. In many instances these compounded differences were substantial, one case, for example, being shown in the record where the extra deductions resulted in the landowner receiving $171.-30 less than the figure which McDowell had accepted as the net-wanted price in the preparation of the option. The protests of the landowners seem to have been unavailing, except that the record indicates one or two instances in which McDowell yielded to the indomitable will (and perhaps the stentorian tone) of the landowner.

4 According to the record, McDowell previously had been engaged in the contracting business. He was a resident of Kansas City, Missouri; the Weldon Springs project was located near St. Louis. Employees of his contracting organization were used to assist in soliciting the options from the landowners.

5 The record and the findings of the trial court leave no question here as to

the actual good faith of the Quartermaster Department in the matter, so that we have no judicial right to condemn the methods which the Department saw fit to employ, unless they are illegal, as a matter of specific legislative prohibition, or of general want of statutory authority, or of inherent and necessary public policy. Cf. United States v. 1,997.66 Acres of Land in Polk County, Iowa, 8 Cir., 137 F.2d 8, 14.

6 The record does not show that the Quartermaster Department ever had sought or obtained the approval of the Attorney General to the system and methods used. The Attorney General's office apparently only was requested to pass upon the sufficiency of each submitted title before the money was paid out. The officer of the Quartermaster Department, who had charge of the matter, testified, however, that he had consulted legal advice (presumably within the War Department) and that he came to the conclusion that the prohibition against "the cost-plus-a-percentage-of-cost system of contracting". did not apply to real estate transactions.

7 United States v. 94.68 Acres of Land in St. Charles County, Missouri, D.C.E.D. Mo., 45 F.Supp. 1016.

8 The opinion of the trial judge in Appeal No. 12,561 is reported in United States v. Certain Land Situate in St. Charles County, Missouri, D.C., 46 F. Supp. 921. The legal views there expressed were accepted and adopted by the trial judge in No. 12,562.

which are now before us, on the Government's appeal.

■ That purchases of real estate, which allow the landowner to fix his wanted-price and then add a certain percentage of this amount for some special purpose, all to be paid to him solely as consideration for the conveyance, literally may be regarded as constituting cost-plus-a-percentage-of-cost transactions, there can be no doubt. That Congress has the right to prohibit the use of any or all cost-plus-a-percentage-of-cost forms or methods of public contracting, there can equally be no question. The argument made here, however, is that the prohibition in section 1 of the National Defense Act of July 2, 1940, should be construed as being intended to apply only to construction contracts, and not to contracts for the purchase of real estate. This was the view of the trial court.

■ It may be conceded that cost-plus-a-percentage-of-cost contracts are most commonly used in and associated with the construction and production fields. But it is clear from the record, as heretofore indicated, that what literally constitutes a cost-plus-a-percentage-of-cost method of contracting is also capable of being used in the real estate field, and that it has been so used, not only in this but on other governmental projects.[9]

In this connection, it is to be noted that the construction of munition plants and the acquisition of real estate necessary therefor are co-ordinate authorizations under section 1 of the Act, and that the language of the prohibiting proviso is unqualified and commands generally that "the cost-plus-a-percentage-of-cost system of contracting shall not be used under this section". The record demonstrates further, not only as an apparent possibility but as a reasonable probability, that the use of such a contracting method in acquiring real estate is productive of some of the very evils which Congress manifestly was attempting to prevent, in any expenditure of public funds under section 1 of the Act. In view of all of the foregoing, we do not feel that there is any sound reason or judicial right to impose such a limitative construction upon the general language of the prohibition, as appellees would have us do with respect to real estate transactions.

One of the evils aimed at by Congress undoubtedly was the tendency of any cost-plus-a-percentage-of-cost system to increase prices to the Government. The probability of that general result in the Weldon Springs transactions is, as we have indicated, quite cogently suggested (and indeed demonstrated) by the record. We do not mean to imply that the record establishes that McDowell's recommendations were altogether dominated by his plus-interest in the contracts, even though he knew that the Quartermaster Department was accepting and approving them without appraisal reports or data. In fairness, it must be recognized that McDowell was trying to do a speedy job, and that his instructions from the War Department were to preserve as much good will in the community as possible. It should perhaps also be stated that only a portion of the total 270 transactions involved are attempted to be detailed in the record. But the transactions shown, without any effort to explain or neutralize them (McDowell did not take the stand), necessarily tend to indicate the general course of dealing in the optioning transactions, and, at the least, they can hardly be said to warrant any inference of commission-obliviousness in the general situation.

We have made passing mention in a preceding footnote of McDowell's attempt, in making closing settlements with the landowners, to collect, contrary to his agreement with the Quartermaster Department (but perhaps within the literal language of the option), commissions upon his own commissions, commissions upon the commissions of the Kansas City Title Insurance Company for closing the transactions, and commissions upon the amounts included in the contracts for revenue stamps and recording fees. We have similarly referred to the instance where McDowell first submitted and recommended approval of an option from an attorney in fact for $4,500; later took an option from the landowner personally for $10,000 and made the same recommendation; and finally wound up, after the Government decided to condemn, with the statement that a value of approximately $4,900 was "a fair appraisal for this land". There is another unexplained incident in the record where the landowner testified that, when he named his own price

---

[9] The record shows that the Quartermaster Department had used the same contracting method as here, in acquiring the land for seven other projects. One of the contracts made on another project was involved in United States v. Grace

for the property, one of McDowell's men declared that "he would like to add fifty dollars an acre more for the land", but, as the landowner put it, "I said that was all I wanted". In the case that was tried by the third district judge, referred to above but not involved in this appeal, the opinion observes that "The price agreed on with Miss Callaway was probably not much more than double what a jury would have awarded her on the evidence presented."[10] In another transaction shown, where a store property belonging to a three-member partnership was being purchased, Mc-Dowell allowed $3,000 to be included in the price of the real estate, for loss on fixtures and merchandise,. and the further sum of $3,000 to be added in, for "1 year's loss in salary of each partner". In still another case, involving the purchase of a garage and store property, the owners were allowed to fix a value of $3,500 upon the real estate and then to add into the price to be paid the sum of $6,500 for "loss of business". What particular elements McDowell had fused into the real estate values recommended by him in any specific transaction were apparently not known to the Quartermaster Department at the time the contracts were approved.

Without further discussing any of the other instances of questionable and inflative elements which the Government attempted to prove on the trial, in order to demonstrate what the general situation had been, we have said enough, we think, to indicate at least the probable tendency of the contracting system used to increase the prices to the Government—and that not merely on the part of McDowell but of the landowners as well.

But it is argued that the evidence does not specifically show that such a result had been produced in either of the two cases that are here involved, and that the findings of the trial court are to the contrary. In No. 12,561, the court made a finding that "The option price of $4,500 is not an unreasonably excessive valuation of the land in question." A similar finding was in effect made as to the option price of $12,000 in No. 12,562. The latter finding is perhaps a bit strained, since the substance of the evidence on behalf of the landowners was simply that the land had a farm value of only $50 an acre (a total of $4,725), but, as the landowners' only value-witness put it, "I think someone from St. Louis that wants a site would pay as high as $125 an acre [a total of $11,800] for that ground."

There is, however, no occasion for us here to review either the Government's or the landowners' evidence as to value in the two cases. If the value of the land were the issue to be determined, we might hesitate to reject the trial court's findings in either case, under Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. But the findings referred to are not determinative of the issue here being considered. We need only repeat, what we have previously attempted to make plain, that the various transactions which have been set out above are intended merely to demonstrate the probable tendency of the contracting system used to produce inflative evils to the Government, and that, in such a general situation, and because the contracting methods employed can literally be said to be within the language of the congressional prohibition, there would seem to be no sound reason or judicial right to impose a restrictive interpretation upon the statute, which would limit its application to construction contracts only, and exclude real estate transactions from its operation. Quite clearly, it seems to us, if a contract is violative of the policy prohibition made by Congress in the field covered by section 1 of the Act, it is invalid per se, and the reasonableness or excessiveness of the price to be paid by the Government thereunder is without legal significance.[11] The proviso of the statute can hardly be regarded as a mere directive to the War Department, but necessarily must be treated as a prohibition to all contracting parties in the field to which it applies.

It is argued, however, that the instant contracts ought not to be held to be within the congressional prohibition, because the trial court has found that "there is no evidence that the option price * *

---

Evangelical Church of South·Providence Ridge, 7 Cir., 132 F.2d 460.

[10] 45 F.Supp. at page 1018.

[11] The language in the opinion in Weil v. Neary, 278 U.S. 160, 173, 49 S.Ct. 144, 149, 73 L.Ed. 243, is appropriate here: "What is struck at in the refusal to enforce contracts of this kind is not only actual evil results but their tendency to evil in other cases. Even if the ultimate results * * * were good, that could be no excuse for a contract plainly illegal * * *."

included the amount the defendants asked for the land plus McDowell's fee of 5% of sale price." But this finding is in our opinion clearly erroneous. It is true, of course, that there was no express testimony that McDowell's commission had been included as a plus-item in the particular contracts. The landowners naturally refrained from going into that point in their testimony, either to affirm or deny. McDowell did not take the stand. The Government, however, conclusively proved that this was the system which the Quartermaster Department had authorized McDowell to use; that it was the plan which McDowell did follow in numerous other transactions detailed in the record; that it was the method which he had explained, to a general meeting of the landowners and their legal representatives, would be employed—and both of the husband-appellees were admittedly present at this meeting; that the use of the system was the subject of heated discussion at the meeting, because some of the attorneys present denounced it as illegal and warned McDowell against the possible consequences; that a general committee of landowners also had been formed and other publicity steps taken, to the end, among others, that the landowners would be fully informed of what was to be done and how it was to be accomplished; and that one of the matters on which the landowners appeared particularly to want assurance was that they were not going to have to pay McDowell a commission out of their wanted-price, but that he was only to have a plus-interest in the contract. To say in this situation that the evidence does not satisfy that McDowell's five per cent was added into the option price in these two cases, pursuant to the undisputed general plan, and to assume, without any such testimony on their part, that these landowners, in disregard of the known general scheme, had philanthropically agreed to pay McDowell a commission out of their own wanted-price, is simply to tax judicial credulity, ignore plain reality, and override inescapable conviction.

■ It is also argued that, since the plus-interest was to go to McDowell and not to the landowner, the congressional prohibition should be held to have no application. But this again is simply an attempt to invite a judicial paring of the statute. Whether the percentage-of-cost interest in a cost-plus contract is made to go to one person or another would hardly insure elimination of the general evil, of which Congress manifestly believed the prohibited system was productive in the field to which the statute was made applicable. Thus, in a construction contract, provision might be made for assignment and payment of the plus-percentage to some creditor, but such a distribution of the fruits from the contract would certainly not give legality to the use of the prohibited system.

■ It is further argued that, upon approval of the option by the Quartermaster Department, McDowell's interest actually had become fixed and certain in amount, and that the contract therefore should be regarded as a cost-plus-a-fixed-fee form of contract and hence not subject to the prohibition. This contention is not without merit and force. The prohibition against the use of "the cost-plus-a-percentage-of-cost system of contracting" in section 1 of the Act is followed with the clause, "but this proviso shall not be construed to prohibit the use of the cost-plus-a-fixed-fee form of contract when such use is deemed necessary by the Secretary of War." We do not believe, however, that it was the intention of Congress—as is the effect of appellees' argument here—that the prohibited system of contracting could become clothed with legality by a mere decoration in form. To so hold is to say that it was merely the cost-plus-a-percentage-of-cost "form" of contract which Congress intended to prohibit, and not the "system of contracting". We think that, in forbidding the use of such a "system of contracting", Congress was intending to reach not simply the form but fully as much the method of dealing and contracting, in the covered field. Certainly, there can be no escape from the fact that it is the method which constitutes the real root of the evil, and that the evil cannot be eliminated by a mere disguising of form. Where, therefore, as here, it is clear, without violation of any rule of evidence or other substantive principle, that the contract dealings between the parties actually represent a use of the cost-plus-a-percentage-of-cost system of contracting, the congressional policy sought to be effected in the covered field, by the prohibition in section 1 of the Act of July 2, 1940, should in our opinion be given full effect.[12]

---

[12] Our attention is called in the briefs to a provision in the Navy Regulations, 34 Code of Fed. Reg. § 8.2400(b), relating to general cost-plus contracts and

■ The point is suggested, though not labored, that the contracts should be considered and construed in the light of the Secretary of War's general powers under the Act of July 2, 1917, 40 Stat. 241, 50 U.S.C.A. § 171.[13] But any contracts made by the Secretary of War, for the construction of munition plants or the acquisition of land for plant sites, involving the use of appropriations made for the period that the Act of July 2, 1940, should remain in effect,[14] would necessarily be subject to the prohibition of that Act, regardless of any powers which the Secretary might otherwise have under the Act of July 2, 1917.

■ Finally, the ad hominem argument is made that the Government should scrupulously be required to live up to its contracts, and United States v. Bethlehem Steel Corporation, 315 U.S. 289, 62 S.Ct. 581, 589, 86 L.Ed. 855, and other cases are cited as supportive authorities. With the general principle argued there can be no judicial disagreement. It should be noted, however, that in the Bethlehem Steel case the contracts involved had been made "pursuant to a congressionally selected policy", as the opinion emphasizes, while here they fly in the face of an express congressional prohibition. It is quite a different thing, from what was held in the Bethlehem Steel case and the other cases cited, to say that public contracts, made by a method or system which Congress has prohibited, should be enforced against the Government simply because a public officer has presumed to enter into them.

One may sympathize, of course, with the ruffled feelings of the landowners whose contracts have now been challenged, after a large number of similar transactions have previously been closed. But that cannot be permitted to obfuscate a plain legal duty. The landowners were, in law, as much charged with knowledge of the congressional prohibition, and of their lack of right to become a party to the use of such a contracting method, as was the Quartermaster Department—albeit they had assumed that they could rely upon the combined wisdom of McDowell and the Department. Despite the momentary hardships and inconveniences which doubtless have been occasioned, no legal injustice will have been done the landowners, for the way is open to them to receive the actual value of their property in the condemnation proceedings, and that is all, in view of the invalidity of their contracts, that they legally, equitably or morally have any right to demand.

The views here taken make unnecessary a discussion of any of the other contentions of the parties.

■ The judgment in each of the two cases is reversed, and the causes are remanded with directions to declare the purchase-contracts invalid, and to appoint commissioners to determine the value of the properties.[15]

---

reading in part as follows: "It is * * * preferable that a fixed profit of a definite sum of money per article be agreed upon instead of a percentage of cost. Such fixed profit can be arrived at by taking a percentage, say, 10 percent, of the estimated cost of each article or the entire job. * * * The fixed profit agreed on should be subject to adjustment, so that the contractor may share in the saving of or be charged with part of the excess of actual cost over estimated cost." This Regulation, however, antedates the Act of July 2, 1940, and manifestly does not purport to have been drawn in any attempted correlation to that Act. Furthermore the Act of July 2, 1940, by its terms, appears to have application to the War Department only. There is no occasion therefore for us to consider or discuss this Regulation here. The congressional policy of the Act of July 2, 1940, necessarily applies only to the field which it was made to cover.

[13] This Act provides in part that "when the owner of such land, interest, or rights pertaining thereto shall fix a price for the same, which in the opinion of the Secretary of War shall be reasonable, he may purchase or enter into a contract for the use of the same at such price without further delay * * *."

[14] By 56 Stat. 317, 50 U.S.C.A.Appendix, §§ 773 and 776, the prohibition of section 1 of the Act of July 2, 1940, was continued in force "during the continuance of the present war and for six months after the termination of the war, or until such earlier time as the Congress by concurrent resolution or the President by proclamation may designate" and was "made applicable to moneys appropriated for the War Department for national defense purposes during the period prescribed."

[15] In United States v. Grace Evangelical Church of South Providence Ridge, 7 Cir., 132 F.2d 460, reversing a judgment of the district court, a contract arising out of a similar contracting method on another project was held valid. The cost-plus question is specifically discussed in the minority opinion, 132 F.2d 463, but is only implicationally involved in the decision of the majority.