**NATIONAL SURETY CORPORATION,**
Appellant,

v.

**The BRUNSWICK CORPORATION et al.,**
Appellee.

No. 22732.

United States Court of Appeals
Fifth Circuit.

Jan. 10, 1968.

Rehearing Denied March 15, 1968.

W. F. Goodman, Jr., Elizabeth W. Grayson, Jackson, Miss., for appellant.

William J. Threadgill, John H. Holloman, William G. Burgin, Jr., Columbus, Miss., Guy Mitchell, Tupelo, Miss., for appellee.

Before RIVES, GEWIN and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge.**

This is a dispute, primarily between two insurance companies, National Surety Corporation and National Indemnity Company, each contending that the other had insurance coverage in force on bowling equipment of Columbus Bowling Lanes, Inc., at the time of a fire loss on June 6, 1962. Alternatively Surety contends that if it is liable to Columbus it is entitled to recover over against National Indemnity.

Surety sued for a declaratory judgment, naming as defendants Indemnity, Columbus, and The Brunswick Corporation, which had sold the equipment to Columbus under a conditional sales contract.[1] In a trial without a jury the District Court found Surety liable to Brunswick and Columbus on the policy which it had issued. It held Indemnity was not liable as insurer of Columbus and not liable to Surety. Surety appeals.

The judgment of the lower court is affirmed. All members of the court agree that the court correctly found Surety was liable to Brunswick and Columbus, and Indemnity not liable as insurer of Columbus. As to those issues this opinion is the opinion of the court. We are not in agreement on whether the district court was correct in holding Indemnity not liable to Surety—a majority of the court are of the opinion that the district court was correct, but it is my view that Indemnity is liable to Surety and that the district court erred in finding otherwise. As to that issue alone, this opinion is a dissent, and the majority will file a separate opinion thereon.

I

The dispute arose from a tangled series of dealings in which Surety had in mind getting off the Columbus risk, Indemnity had in mind issuing to Columbus coverage as a replacement for the Surety policy, and Puckett (acting for both insurers with the knowledge of both) had in mind accomplishing these same purposes. Columbus, while objecting to the desire of Surety to terminate its policy, negotiated with Puckett for proposed coverages with Indemnity. Brunswick, the loss payee under the Surety policy and in possession of the original thereof, was not informed of anything by anyone concerned.

There were many actors: local agent Puckett, Dupuy (the Mississippi state agent for Indemnity), the home office of Indemnity, various agents for Surety, the Atlanta office of Surety, two officers of Columbus, the Mississippi Rating Bureau, and others. There were meetings, correspondence, telephone calls, memoranda, proposals and counter-proposals and amendments. When the property burned Surety, Indemnity and Puckett all believed that Surety had no further exposure on the risk and that Indemnity had taken over the coverage. All were mistaken. It is without dispute that Puckett had no authority from Surety to cancel its policy and that Surety did not elect to cancel under the cancellation provisions of its policy requiring it to give ten days written notice to the insured.

---

** In part this is the opinion of the Court and in part a dissent, as explained below.

1. There were assorted other defendants and various crossclaims and counter- claims, none of which affect our disposition of the case.

It had not marked the policy as cancelled on its books, had not cancelled the re-insurance in effect on the policy, never tendered any return of premiums and had notified Puckett it would not cancel until it received the original policy for cancellation or exercised its ten-day cancellation right, neither of which had occurred. Proposed policies in Indemnity had never been delivered to Columbus, never signed, and had not been sent to Brunswick since never acceptable to Columbus (and at least one proposed Indemnity policy had been marked "void" and a proposed substitute, also unsigned, was in the mails to Puckett). No binder, oral or written, was issued by Indemnity. The proposed Indemnity policies, which Columbus had not even seen, were at a deviated rate and on a standard Mississippi fire form, which differed in material respects from Surety's Inland Marine form that had been issued to Columbus.

The court found that Columbus did not agree or consent that the Surety policy could be replaced by any Indemnity policy or consent for Puckett to waive the ten-day cancellation notice. It found that Columbus did not accept Indemnity policies as a substitute, and that no understanding was reached between Columbus and Puckett as to either details or amount or effective date of proposed coverage with Indemnity. These are factual matters and the findings of the trial court are not plainly erroneous. F.R.Civ.Proc. 52(a). There having been no cancellation of its policy by Surety and neither completion nor delivery of Indemnity policies and no acceptance by Columbus of Indemnity policies as substitutes for the Surety policy, we affirm the holdings that Surety is liable to Columbus and to Brunswick under its policy and that Indemnity is not liable to Columbus as its insurer.[2]

**2.** This determination obviates discussion of many of the questions developed at length by the parties: whether under Mississippi law there may be an oral agreement to insure, since the court found Columbus and Indemnity reached no agreement; whether changes in amounts of proposed Indemnity policies and changes of part of the proposed In-

## II

This brings us to the question whether there is any liability of Indemnity to Surety. The trial court found Indemnity not liable. I disagree, and dissent from the separate opinion of the majority on this single issue.

There is no dispute that all parties intended Indemnity was to take over the Columbus risk, and that the parties concerned in this appeal, except for Columbus and Brunswick, understood that at the time of loss Indemnity in fact had taken over the risk. On April 13 Surety wrote Puckett it was terminating his agency contract. As to the Columbus policy the letter read in part:

"[W]e prefer that you cancel the captioned policy, as we do not care to run this one to expiration * * *. We certainly hope that you will be able to replace the captioned policy in one of your other companies within the next ten days."

Surety's position that the policy must be replaced or cancelled never changed. Surety could have exercised its ten-day cancellation right by giving notice to Columbus. The alternative of withholding notice of cancellation and allowing the agent to place the risk in another company was for the agent's benefit, protecting his relation with his customer and the hope of renewal of the business, and for the benefit of the insured, saving it the risk of being caught without coverage.

Puckett began seeking to place the risk in another company, negotiating with several, but he experienced difficulty because bowling alleys are hazardous risks. On April 18 he wrote Dupuy, state agent for Indemnity who was authorized to bind that company, describing the need for coverage, suggesting use of a stand-

demnity coverage from one proposed Indemnity policy to another proposed Indemnity policy were modifications of an agreement to insure; whether the policies of both companies were in effect and Surety liable only for excess over the Indemnity limits; whether Brunswick had lost its right to approve a new insurer agreed to by Columbus.

ard fire policy form, and asking Dupuy to be of assistance.[3]

On April 25 Surety's agent visited Puckett and picked up records and papers. At this visit the Surety agent again talked with Puckett about having its policy cancelled or replaced. The trial judge found, and correctly so, that Puckett continued thereafter as Surety's agent for the limited purpose of replacement of the Surety policy. The Surety agent reported to his company that Puckett promised to "cancel" promptly (since Puckett had no authority to cancel this could only be by replacement of the Surety policy with another. See footnote 5, infra), and recommended if this was not done by Puckett in 10 days a direct cancellation notice should be sent. No such notice was ever sent.

On May 3, after another inquiry from Puckett, Dupuy wrote Puckett with a copy to Indemnity's home office, "We will be pleased to handle" the coverage (describing it) * * *. "This policy can be written on (describing it) plan * * *. Before binding coverage, please wire or call in order that we can place our reinsurance."

At a date in May not specified Surety's state agent visited Dupuy's office in Jackson. Dupuy wanted to know why Surety would not stay on the policy until expiration. Dupuy told the Surety agent that Indemnity could write the risk in July and "intimated" to him that Indemnity was "going to pick up the liability." On May 21 Surety wrote Puckett, requesting return of its original policy for cancellation and stating "We will not be in a position to continue this policy to expiration."

Under practice of the industry the company taking over the risk (Indemnity) might do so by leaving the existent (Surety) policy in force and reinsuring Surety from loss thereon during the unexpired term, or Indemnity could write new policies with resultant cancellation of the old policy by operation of law.

(See footnote 5, infra.) On or before May 28 Puckett discussed with Dupuy whether it would be better for Indemnity to reinsure Surety's policy or issue new Indemnity policies. Indemnity made the choice to take over the coverage by issuance of its own policies, and Dupuy notified Puckett to that effect. Dupuy suggested the effective date of June 1 for the Indemnity policies, as that would give Indemnity time to arrange for its reinsurance.

May 28 is an important date. On that date Puckett wrote Surety,

"Please cancel the above policy effective June 1, as this coverage is being placed with another company effective that date.

"Please advise the Transit Casualty Company to cancel re-insurance effective the same date and we would appreciate your forwarding prorata return premium of $292.87, which is 14 percent of $2091.97.

"We are forwarding the new policies to the Brunswick Corporation and the Brunswick Automatic Pinsetter Corporation, asking that they return the original policies in order that we might forward them to you."

The same day Puckett typed up two proposed Indemnity policies, dating them June 1, and made a ledger entry charging Columbus for the premiums thereon as of June 1. (Under Puckett's procedures Columbus would not be billed until July 1, and was billed at such time.)

The next day, May 29, the home office of Indemnity wrote Dupuy:

"Under date of May 3rd, 1962 you forwarded our office copy of your letter to the procuring agent for the above which indicated that coverage would be placed with the National Indemnity Company.

"We have heard nothing further from your office since the date of May 3rd and would appreciate receiving the

---

3. It is not clear whether Puckett then was an agent of Indemnity, but it is stipulated that in May and June he was.

benefit of your advice regarding this particular risk."

On May 30 Dupuy wrote the Indemnity home office. He said "Please refer to my letter of 5/3/62 on the above * * *. I authorized coverage today with our agent Willis Puckett Ins. Ag., Columbus, Mississippi." This crossed in the mails the Indemnity home office memo to Dupuy dated May 29.

From the May 30 memo until after the fire Dupuy had no further communication with the Indemnity home office.

Surety wrote Puckett on June 1:

"In reply to your letter of 5–28–62 we will need the assureds copy of this policy to cancel it. Otherwise we will have to send notice of cancellation which will earn another 10 days premium under the policy.

"Please return the assureds copy for prompt cancellation."

On June 4 Dupuy replied to the May 29 memo from the Indemnity home office, by writing on it at the bottom: "See #F41027 ($134,400)—F11028 ($74,400) Eff 6/1/62 This is a new bowling alley 2 or 3 years old and under protection in a steel building Thanks". Dupuy testified that "Eff" meant "effective."

On June 6 Puckett responded to Surety's June 1 inquiry by a memo on the bottom thereof: "We *have issued* new policies effective June 1, 1962, in National Indemnity Company, Policy F41027 and F41028. As soon as original copies [of Surety policy] are received from Brunswick Corporation we will forward to you. *Your coverage* (SFP18332) *is no longer in force*." This substantiated what Dupuy had told Surety on May 28 and Indemnity on May 29 and again on June 4.

Also on June 6 Puckett, in writing Dupuy about changes in the proposed Indemnity policies, added "National Surety is still breathing down our backs about returning originals."

Beginning in the last days of May and up to the time of the fire Puckett was negotiating with Columbus about Columbus accepting Indemnity policies as re-

placements for the Surety coverage. Since this court unanimously agree Columbus did not accept them the details of the negotiations need not be set out.

On the night of June 6–7 the fire occurred. During the day of the 7th Puckett reported the loss to Dupuy by phone. Dupuy acknowledged Indemnity was responsible. He raised no question of coverage but only of whether the last-minute discussions with Columbus of amount of coverage imposed on Columbus what he thought to be a "moral duty" to recognize that the amount of coverage had been reduced. The same day Dupuy, in Jackson, saw the Surety agent on the street and said *"Boy, you must be living right * * * Willis just called us on the phone this morning, and to report the loss, that the bowling alley had a fire last night."* Also on the 7th, Puckett employed an independent adjuster to adjust the claim for Indemnity. He gave a statement to the adjuster that he had placed the risk with Indemnity on June 1.

Columbus notified Surety of the loss on June 8.

During June, but on dates not known, two other events occurred. In his monthly accounting with Indemnity, Puckett showed he was indebted to Indemnity for the Columbus premiums. And Indemnity cancelled its general agency agreement with Dupuy's agency.

Around July 1 Puckett billed Columbus for the Indemnity premium in the usual course of business. This was done by sending as an invoice a copy of the ledger sheet made up on May 28. On July 5 Puckett wrote Indemnity he was "looking for" it to pay the loss.

In September, on the 10th, Puckett paid to Dupuy's agency the amount due it for the Indemnity premium. Columbus had not, and did not, pay the Puckett agency the Indemnity premium. Later that month, on the 24th, Dupuy sent Puckett a check refunding the Indemnity premium.

Before and after the fire in all his dealings with Indemnity, and in his answer filed in this case, and in his

testimony, Puckett took the position that beginning June 1 Indemnity was on the risk. His unequivocal testimony, not contradicted by Dupuy, was that he had "an agreement with Aaron Dupuy that National Indemnity had taken over this risk." He testified that in sending the first Indemnity policies back and getting them rewritten he did not intend to get Indemnity off the risk. In the end everyone except Columbus and Brunswick thought that Indemnity had become liable on its policies on June 1—the Atlanta and Jackson offices of Surety thought so, the home office of Indemnity thought so, and Puckett and Dupuy thought so. It is anomalous indeed to conclude that what all these parties understood was to happen, and what all thought had happened, was never agreed to by Indemnity. By the letter of May 28 Puckett created an *obligation* to have coverage placed in another company and in effect on June 1. His statement in the letter is not qualified by any ifs or buts. His commitment was made with full authority from Indemnity and was exactly the means chosen by Indemnity to take over the handling of the risk.

The undertaking between Surety and Indemnity was not, as the parties have approached it and as the trial court viewed it, a matter of reinsurance or indemnity.[4] It was no more and no less than an agreement by Indemnity with Surety under which Indemnity obligated itself to take over the Columbus risk on June 1 by having its policies in effect that date, which by operation of law contemporaneously would relieve Surety of liability on its policy.[5] Indemnity's liability is not as insurer of Columbus, which it never became, and correctly

speaking not as reinsurer or indemnitor of Surety, *but for breach of its contract to take over the risk June 1*. Surety's damages for the breach are an amount equal to what it must pay on the Columbus loss.

The trial court found: "[I]t is clear that Puckett, Surety and Indemnity all fully believed that Surety had no further exposure on this risk and that Indemnity had fully assumed and was responsible for the coverage." But it denied relief to Surety on two grounds—that the dealings between Surety and Indemnity did not reach the status of a binding contract and that no consideration moved from Surety. As to the first, there is no dispute as to any material fact. Review is not under the "plainly erroneous" rule as to facts but of conclusions of law based on what people said and did. Surety offered to get off the risk, to give up the unearned premium and the chance of renewal to any other company which would take over the risk. The offer was continuing, open to whatever company might accept it. *Indemnity accepted, agreeing to take over the risk on June 1 by having its replacement policies effective that date. It failed to have its replacement policies in effect as agreed* because of failure to reach an understanding with Columbus as to amount and details of coverage. Puckett's candid testimony of his agreement with Dupuy, his letter of May 28 to Surety, Dupuy's memos of May 20 and June 4 to the Indemnity home office, and Puckett's letter of May 6 to Surety state clearly what Indemnity obligated itself to do, and the conduct of the parties after the fire reaffirm the obligation. That, as found by the trial court, Surety, Indemnity and

---

4. As to lack of clarity in use of term "reinsurance," cf. Waterloo Lumber Co. v. Des Moines Ins. Co., 158 Iowa 563, 138 N.W. 504, 51 L.R.A.,N.S., 539 (1912); Massasoit Steam Mills Company v. Western Assurance Co., 125 Mass. 110 (1878); 13 Appleman, Insurance Law, Sec. 7681 et seq. (1943).

5. Home Ins. Co. v. Campbell, 79 F.2d 588 (4th Cir., 1935); White v. Ins. Co. of

New York, 93 F. 161 (C.C., D. Rhode Island, 1899), aff'd, 103 F. 260 (1st Cir., 1900); Lee v. New Hampshire Fire, 154 N.C. 446, 70 S.E. 819 (1911); Automobile Ins. Co. of Hartford, Conn. v. Southern Transportation Co., 101 S.W.2d 585 (Tex.Ct.Civ.App., (1937). See generally Baysdon v. Nationwide Mutual Fire Ins. Co., 259 N.C. 181, 130 S.E.2d 311 (1963) and 6 Appleman, Insurance Law, Secs. 4196, 4225 (1942).

Puckett believed (mistakenly) that Surety was off the risk and Indemnity on it does not alter or diminish Indemnity's agreement or the consequences of breach thereof. A transitory misunderstanding by the parties over whether there has been *performance* does not vitiate the *contract* they have made.

The district court found there was no consideration moving from Surety because *its initial decision not to exercise* its ten-day cancellation right was made prior to representations from Indemnity, and after Indemnity made its firm representation (May 28) there was less than 10 days remaining before the fire so that Surety was not injured and there was no estoppel. This is error of law. The contract was bilateral—agreement for agreement—Surety's continuing commitment, open to acceptance by any company, that it would continue to forbear exercising its cancellation right, to which Indemnity responded with its commitment that its policies would be in effect on June 1. The mutual agreements were consideration.[6] Second, if actual forbearance to cancel, rather than the agreement to continue forbearing to cancel, is treated as consideration the date of the loss, and the ten-day period, have nothing to do with whether that consideration is valuable. The forbearance is the giving up by Surety of *its right to send* the ten-day notice that ultimately would result in cancellation. In retrospect we learn from the fire having occurred on June 6 that if Surety had not forborne the right but had exercised the right on May 28 or thereafter, the exercise would have been ineffective. But what would have happened if Surety had not forborne the right does not retrospectively make what was valuable consideration lose its value. (It is immaterial whether Surety's failure to send the 10-day notice is in terms of forbearance as consideration, or estoppel against Indemnity, the consequence is the same.)

The giving up of an option the day before its expiration, after the transferor has acknowledged his inability to exercise it, is sufficient consideration. 1 Williston, Contracts 458 (3d ed. 1957). Giving up a claim to the possession of land is sufficient consideration. 1 Williston, supra at 570 & n. 1. Giving up the right to apply for permission to increase rents is consideration. 1 Williston, supra at 570 & n. 1.

The law does not concern itself with *adequacy* of consideration, only with *valuable* consideration. The lower court confused adequacy (measured retrospectively at a later time) with value measured as of when the contract is consummated; see 1 Williston, supra § 115; and the majority fall into the same error.

The original decision of Surety not to exercise its ten-day cancellation right was as an accommodation to the insured and the agent, and made before representations by Indemnity, but to hold this prevents forbearance (or agreement to forbear) from being consideration confuses motive with consideration. See discussion in 1 Williston, supra § 111. Surety held itself out to the industry as willing to forbear cancellation pending taking over of coverage by another company. If that offer was accepted (by either promise or action) of another company, and forbearance continued (as it did), the subjective motive Surety had for initially holding out willingness to forbear cancelling is not relevant.

The majority are concerned that Indemnity did not bind itself by specific

---

6. Brenard Mfg. Co. v. Miller & Robinson, 158 Miss. 892, 131 So. 274 (1930); Magnolia Lumber Corp. v. Czerwiec Lumber Co., 207 Miss. 738, 43 So.2d 204 (1949); In re Sadler's Estate, 232 Miss. 349, 98 So.2d 863 (1957).

While we deem the writings alone sufficient to constitute acceptance of Surety's continuing offer and an undertaking to perform by June 1, the entire course of Indemnity's actions (including the writings) manifestly constituted acceptance and a commitment to a time of performance. Offer and acceptance can be by words, or acts, or both. Rhyne v. Gammil, 215 Miss. 68, 60 So.2d 500 (1952).

words to secure consent of Columbus and Brunswick to the Indemnity policies. Puckett's statement of May 28 that the coverage "is being placed with another company effective [June 1]" coupled with instructions to Surety to cancel its reinsurance effective June 1, is unconditional. That one does not obtain the consent of another which is an essential prerequisite to the very result one obligates himself to bring about is not a defense to the obligation nor does it give rise to a defense of frustration or impossibility. Also the majority are not convinced that Surety and Indemnity had an intent to contract with each other. This approach drains the life out of the law of offer and acceptance. Surety made an offer to get off the risk. Indemnity accepted. The concern is with manifestations of intent, not with undisclosed mental attitudes. The offeree may not assert a meaning at variance with what it said. 1 Williston, supra § 66–67A.

Neither Aetna Insurance Company v. Renno, 93 Miss. 594, 46 So. 947 (1908), second appeal, 96 Miss. 172, 50 So. 563 (1909) nor Connecticut Fire Insurance Company v. Harrison, 173 Miss. 84, 161 So. 459 (1935) has anything to do with the right of a first insurer for damages from a second insurer who contracts to take over the risk and breaches that agreement. Both deal with liability of the respective insurers at the suit of the insured where a *common agent* has cancelled (in the *Connecticut* case, reduced) coverage of the first insurer without knowledge or notice to the insured and unknown to the insured has written a new policy in a new company.

What happened in this case was the routine business transaction of agreement by one insurer to take over the

risk of another, a familiar procedure in the industry, made through a dual agent who had full authority.[7] It is made to appear as difficult and fraught with perils as climbing Mt. Everest. No one had any doubt what was the posture of the parties and their obligations except the home office of Indemnity, and that position came into existence only after the loss and in derogation of the understanding of the Indemnity agents on the scene who were authorized to contract on its behalf.

\* \* \*

The evidence of the amount of the Columbus loss was sufficient that the findings of the trial court were not clearly erroneous. Interest was properly awarded.

Affirmed.

RIVES and GEWIN, Circuit Judges:

 As our brother Godbold has said, we all agree with the district court that Surety was liable to Brunswick and Columbus and that Indemnity was not liable as an insurer of Columbus. We two Judges also agree with the district court's other findings and conclusions, including those having special reference to the claimed contract between Surety and Indemnity, such as the following:

"23) It is generally accepted that even for an oral contract of fire insurance (and such contracts are recognized in this state) that the elements of such a contract are identity of the property insured, the risk insured against, the period the insurance is to be in force, a promise to pay or indemnify in a fixed or ascertainable amount, and the premium to be paid (premium may be implied to be at the usual and customary rate). But, as in any contract, *the minds of the parties*

---

7. Puckett acted for both companies with knowledge by both companies of his role. While no longer agent for Surety for the purposes of writing policies he continued as its agent for the limited purpose of getting it off the Columbus risk, and the trial court found acted diligently and honestly in believing Surety was off the risk and Indemnity on it. His dual agency does not excuse Indemnity from its obli-

gation. Palmer v. Chamberlin, 191 F.2d 532 (5th Cir., 1951); Phillips Petroleum Co. v. Peterson, 218 F.2d 926, 934 (10th Cir., 1954), cert. denied, 349 U.S. 947, 75 S.Ct. 871, 99 L.Ed. 1273 (1955); United States v. Grace Evangelical Church, 132 F.2d 460 (7th Cir., 1942); Restatement (Second), Agency Secs. 390–92 (1958); 5 Williston, Contracts Sec. 1532.

*must meet on every material point.* If there is lack of agreement on any essential feature the contract is not binding. These essentials may be understood from custom, course of dealing or other circumstances from which assent (agreement) may be fairly implied. These principles apply also to contracts of reinsurance.

"24) Applying these principles to the situation as between Columbus and Indemnity, it is clear to the court that no valid, enforceable contract was in force at the time of the fire. At least one essential element was absent—the amount of insurance. There was no meeting of the minds in this particular. Columbus says reduction of the amounts of insurance was being discussed, while Indemnity (Puckett) says reduction was agreed. This court has adopted the Columbus version and has also said, perhaps obliquely, that the insurance represented by the two Indemnity form policies which were held briefly in Puckett's office was not firm and binding. At most these form policies were offers by Indemnity to insure Columbus, according to the terms set forth therein. And, these offers were not accepted, nor was the first change ordered by Puckett (which would have transferred $10,000 of insurance from pinsetters to lunch counter) effective. There was no meeting of the minds here, or, even if there was momentarily, as to amounts only, a change was ordered by Puckett, almost immediately, and was not accepted or effective before the loss. It must be remembered also, as has been said, no binder (written or oral) was issued by Puckett to cover Columbus pending formal execution of the changes ordered by him. And, the fact that Puckett paid Dupuy, for the use and benefit of Indemnity, the premiums for the Indemnity coverage he (Puckett) thought was in effect, at the time of the loss, does not change what has been said. This payment was not accepted by Dupuy for the purposes for which it was tendered and it was returned to Puckett and accepted by him when the full facts were known.

"25) The discussion with respect to Columbus and Indemnity has been undertaken to some extent to point the way to the route which this court must follow in making disposition of the issues between Surety on the one hand and Dupuy and Indemnity on the other. A start is made by saying that, applying the aforementioned principles of law, obviously there was no contract between Surety and Indemnity even in the nature of an oral contract of reinsurance. There was, at best, an informal interchange of information between the state agent of Indemnity, whereby each of these insurance companies, at that level and, perhaps, at higher levels, believed that Surety was off this risk and Indemnity on. Additionally, there was the unequivocal representation to Surety from Puckett (as the writing agent for Indemnity) that the Surety policy was cancelled and had been replaced by Indemnity coverage. Also, it was understood between the state agent for Surety and Dupuy, as the general agent for Indemnity, immediately after this loss, that the loss was the responsibility of Indemnity and not a liability of Surety. But, it must be remembered that there is no evidence to indicate or suggest that there was forbearance to cancel its policy on the part of Surety (at any time when Surety could have formally cancelled its policy before the loss) because of anything said or done by Dupuy or by reason of anything said or done by Puckett. And, Surety, as has been said, elected not to cancel its Columbus policy contrary to the recommendations of its state agent before any firm representations were made to Surety by either Puckett or Dupuy. After that election by Surety, when firm representations were made by Puckett to Surety that its policy had been cancelled, there then was not enough time remaining within which Surety could have cancelled its policy according to its terms, by giving ten days written notice. Thus, Surety was not injured thereby. And, the evidence is not sufficient to permit the court to find and hold that there was any custom within the insurance industry, nor any

course of dealing between Surety and Indemnity which would make any liability on the part of Indemnity to Surety attach in these circumstances, and which would in fact convert this incomplete situation into, or construct therefrom any contract between Surety and Indemnity either of insurance, reinsurance or indemnity.

"26) To summarize as to Surety, Indemnity, Dupuy and (for clarity) Puckett, nothing was done by any one, or more, or all of them which placed Surety in any worse position than Surety was in at the beginning of these developments. No consideration, by forbearance to cancel, moved from Surety to Indemnity, to Dupuy or to Puckett. No action by Indemnity, by Dupuy, by Puckett or any of them misled Surety so as to cause Surety to assume or accept any greater risk than Surety already had or to cause Surety to continue with said risk. Surety contracted for this insurance, but wanted to relieve itself of risk in advance of the expiration date of the contract. Apparently as a matter of policy and through no fault of Indemnity, Dupuy or Puckett, Surety elected not to cancel this policy by written notice for the time and in the manner specified in its own contract. In these circumstances, Surety cannot now shift any of its burden to Indemnity, to Dupuy, or (as has been said) to Puckett. There was no contract between Surety and Indemnity and the circumstances shown by the evidence are not sufficient to create such a contract by estoppel or acquiescence, if this, in any event, could ever properly be done. Surety is entitled to no relief against either Indemnity or Dupuy."

We agree with the district court that there was no intention of either Surety or Indemnity to enter into a contract directly with the other. Surety had a contract with Columbus and Brunswick. It desired to be relieved of that contract and Indemnity desired to enter into a contract, not directly with Surety but with Columbus and Brunswick. Columbus was the nexus between Surety and Indemnity. Both Surety and Indemnity were keeping each other advised of their respective dealings with Columbus, not however with any idea of contracting between themselves but simply as a matter of ordinary business courtesy and cooperation. There was simply no contract between Surety and Indemnity. The judgment is therefore

Affirmed.

## ON PETITION FOR REHEARING

## PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, Rule 25a, subpar. (b), the Petition for Rehearing En Banc is denied.

GODBOLD, Circuit Judge dissenting.