**WEEKS v. PRATT et al. (two cases).**
**Nos. 5729, 5795.**

Circuit Court of Appeals, Fifth Circuit.
Sept. 5, 1930.

Rehearing Denied Sept. 27, 1930.

James H. Bunch, of Jacksonville, Fla., for appellant.

Mac Asbill and Edgar Watkins, both of Atlanta, Ga., and Walter F. Rogers, of Jacksonville, Fla. (Edgar Watkins, Jr., and Watkins, Asbill & Watkins, all of Atlanta, Ga., on the brief), for appellees.

Before BRYAN and FOSTER, Circuit Judges, and SIBLEY, District Judge.

FOSTER, Circuit Judge.

These two appeals have the same title, involve the same parties, and arise from the same transactions. They may be disposed of by one opinion.

Appellees, Nathaniel P. Pratt and George L. Pratt, filed a suit in equity against Charles J. Weeks, appellant, to compel specific performance of a contract dealing with the patenting and exploiting of certain inventions of the defendant, to be enforced by prohibitory and mandatory injunctions, and for damages. Judgment was entered for plaintiffs, granting injunctive relief as prayed for, and their damages were fixed at $81,026.68, with interest. The defendant failed to procure a supersedeas, and his interest in the inventions was sold under order of court, and was bought in by plaintiffs for some $38,000, which was allowed to be credited on the judgment. The appeal in No. 5729 is from this judgment.

In No. 5795 the appeal is from a judgment holding the defendant in contempt of the final decree, under which he served some thirty-three days in jail before obtaining a supersedeas and bail. As a decision on this appeal will follow the disposition made of the appeal in No. 5729, no more need be said about it.

The material facts are these: Charles J. Weeks is a retired locomotive engineer, some 65 years of age. He had invented a device designed to increase the mileage of automobiles operated by internal combustion engines. Part of this apparatus, called an oil-cooling device, had been patented. He had also discovered or invented a new automobile fuel. Nathaniel P. Pratt and George L. Pratt are brothers engaged in a general engineering and financing business. In July, 1927, Weeks demonstrated his fuel-saving device, which he had installed on a Hudson automobile, to the Pratts and others. The car ran a distance of 49.2 miles on one pint of ordinary gasoline, an average of nearly 400 miles to the gallon.

Weeks also demonstrated his fuel to plaintiffs by mixing with one quart of water a small quantity of other liquids taken from five different bottles. The mixture burned like ordinary gasoline.

Weeks stated to plaintiffs that he had had negotiations with representatives of the Reo Motor Company and the Ford Motor Company, and had received an offer of $1,350,000 from one oil company and $1,000,000 from another company for his inventions; that he feared the object of these negotiations and offers was to prevent the use of his inventions and that he wanted the public to have the benefit of them; that his fuel had not been perfected; that some of the ingredients had been put in simply to prevent analysis; that it was composed of 99 per cent. water, and could be manufactured for about 1 cent per gallon; and that he would not give any information whatever as to it until he had entered into a written contract.

The plaintiffs were convinced of the efficiency of defendant's inventions, and entered into negotiations with him to finance and develop them. Weeks insisted upon retaining control of his inventions, and they agreed to give him 51 per cent. interest and have 49 per cent. interest for themselves. It was decided to apply for patents on the fuel-saving device, but it was not decided whether to apply for a patent on the fuel or to keep the formula secret.

A patent attorney, Mr. Parry, was engaged by plaintiffs, and he visited Jacksonville and examined Weeks' device, first taken apart and then reassembled, and witnessed a successful demonstration of the car. He prepared applications for patents with the assistance of Weeks, and they were filed. Negotiations for a contract continued, but were not successful until Weeks had changed his attorney. A written contract was then drawn up and entered into on September 13, 1927. It is rather lengthy, but its material features may be somewhat briefly stated.

The contract, in substance, provided that a corporation should be organized under the laws of Florida, to be known as the Weeks-Pratt Corporation, with a capital stock of 25,000 shares of preferred stock, par value

of $100, and 1,000,000 shares of common stock having no par value. The preferred stock was to be divided 12,500 shares to defendant and 2,500 shares to plaintiffs, full paid and nonassessable. In addition, the plaintiffs were to pay into the corporation $100,000 in cash, for which they were to receive 1,000 shares of preferred stock, and they might be required to purchase up to 9,000 additional shares of preferred stock at par if and as needed for additional capital. The voting power was vested entirely in the common stock, and this was to be divided 510,000 shares to the defendant and 490,000 shares to the plaintiffs. The corporation was to have a board of directors composed of seven, nine, or eleven members, the number to be later agreed upon. If it should be decided to have seven members, the defendant should name four, if nine, he should name five, and if eleven, he should name six; the remaining directors to be named by the plaintiffs. It was further provided that none of the assets of the corporation should be sold, mortgaged, or licensed without the affirmative vote of at least two-thirds of the number of directors at the time; and that a similar affirmative vote of two-thirds should be required to purchase other property, organize other corporations, to develop or exploit any of the assets of the corporation, to fix salaries, elect officers, pay dividends, or change the by-laws as they might originally have been adopted. It was provided that defendant might be the chairman of the board if he so desired, but that a good business man should be selected as president. The defendant was obligated to transfer a one-half interest in his existing patents for an automatic fire door, the oil-cooling device, the inventions of the fuel-saving device, and the new fuel, to the plaintiffs, they in turn to transfer the said undivided one-half interest to the corporation to be formed and he also to transfer his remaining undivided one-half in said patents and inventions to the corporation. The contract provided that the plaintiffs should pay to Weeks $10,000 upon its execution and should pay him a salary of $1,000 per month until the corporation was organized, after which Weeks was to receive the same salary from the corporation for his services, including those as chairman of the board. Weeks had expended $8,000 on his inventions prior to the making of the contract. This and all sums paid him by plaintiffs were to be reimbursed to the respective parties by the corporation. Weeks was obligated to continue his studies and experiments as an inventor and to assign any future discoveries or inventions to the corporation. No definite term was fixed for his services. The plaintiffs agreed to use their skill, learning, and energy in the study, discovery, development, and exploitation of the processes and inventions of defendant. The contract contained a clause that, if it should develop there was no reasonable prospect of making the inventions commercially successful, the plaintiffs might serve notice on Weeks, and he would be discharged of his obligations, and they would be under no obligation to make further payments or advances, but they would retain a one-fourth interest in any of the patents that had been theretofore obtained or inventions or discoveries that had been made. Weeks was given an option for one week after their delivery to him to sell 1,000 shares of his preferred stock to plaintiffs. There was no obligation expressed for them to buy. The contract contained this clause: "This is an entire contract. Each part shall be dependent on every other part." Weeks was obligated to disclose the formula of his fuel to plaintiffs within sixty days after the contract was signed. Other provisions of the contract are comparatively immaterial.

On the day the contract was signed, Weeks demonstrated his new fuel in a Nash six-cylinder automobile, in the presence of plaintiffs and others. The car ran a distance of 19.8 miles, at a speed of approximately 25 miles an hour, on one gallon of the fuel, and only 7.8 miles on a gallon of ordinary gasoline.

After the applications had been made for patents, George Pratt installed an apparatus on a Jordan eight automobile, belonging to him, in accordance with the specifications and plans forming part of the patent application. On testing the car, it did not develop nearly as much mileage as had been obtained in Weeks' Hudson car but it did run 37.5 miles on one gallon of gasoline. The testimony is conflicting as to whether this installation was made with the consent of Weeks, but he had no part in its installation, and it is reasonably certain that the apparatus was not identical with that used by Weeks on his own car. Weeks told plaintiffs and the patent attorney that he got his results from low vacuum and high compression and that he had planed off the head of the motor on his car until he got a compression of 140. It is not shown that any attempt was made to coordinate the cylinder capacity with the device installed on the Jordan automobile.

The patent attorney sought further infor-

mation from Weeks for the purpose of prosecuting the applications for patents, and Weeks was either unable or unwilling to give it. At any rate, the patent attorney could not understand his explanations. Weeks testified he told him all he knew about the device.

Weeks delivered to plaintiffs a five-gallon jug of what he said was his fuel, but on being tested it developed no more power than ordinary gasoline, and on analysis it was shown that it would cost between 35 cents and 50 cents a gallon to manufacture. He declined to give any further information as to the formula for his fuel.

A draft of the proposed charter was drawn up and submitted to Weeks on October 20, 1927, and he declined to sign it because it provided for organization with two shares of preferred stock and two shares of common stock to himself and two shares of each to both of the plaintiffs, which he thought would give them an interest of 66⅔ per cent. and control of the corporation, and, further, because he had discovered the clause in the contract which allowed the plaintiffs to recede from it on giving notice, which he contended he had not known about at the time of signing. The corporation was not organized. The draft of the charter is not in the record. We may assume it complied with the provisions of the contract.

The plaintiffs alleged in the bill that their damages amounted to $10,000,000. They testified that the fuel-saving device and the fuel were each worth at least $20,000,000. Expert witnesses introduced by plaintiffs fixed the value of these inventions at from $20,-000,000 to $1,000,000,000.

■ We may put aside any discussion of whether defendant was guilty of a breach of contract warranting a judgment for plaintiffs in a suit at law. This is an appeal in equity. The whole case is before us, and we may render such decree as may be just and proper in the premises. Ridings v. Johnson, 128 U. S. 212, 9 S. Ct. 72, 32 L. Ed. 401.

■ The granting or withholding of the relief of specific performance is within the discretion of a court of equity, and is not a matter of right. Clarke v. Aiken (C. C. A.) 276 F. 21.

■ It is fundamental that equity will not lend its aid to the enforcement of a contract unless it is fair, equal, and just and based upon adequate consideration. Pomeroy's Specific Performance (3d Ed.) pars. 175–192.

■ There is no doubt that Weeks wanted the public to have the benefit of his inventions and therefore would not sell them to any one who would suppress them. Plaintiffs clearly so understood. It was this intention that animated Weeks in entering into the contract with plaintiffs, and he did so only because he was assured that he would have control of the corporation to be formed to exploit his inventions. The provisions that he should own a majority of the shares of voting stock and have the right to name a majority of the board of directors, standing alone, would give him such control, but other provisions of the contract completely nullified them. Weeks could be chairman of the board, but that term is indefinite and has no significance in law. He was not to be president; therefore he could not manage the business nor direct its policies personally. He derived no power through the right to name a bare majority of the directors because of the clause requiring two-thirds of the directors to concur in any important administrative act. The proportion of the directors to be named by Weeks, four, five or six, did not constitute two-thirds. Directors cannot be divided into fractional parts. A practical application of the clause would require action to be taken by either five, six, or eight directors, according to the number selected. It is unnecessary to impugn the good faith of the plaintiffs in considering this feature of the contract. The fact remains, through their right to name more than one-third of the directors, that they had it within their power to veto any action Weeks desired and to create the very condition of inactivity that he wanted to avoid. The contract therefore was not fair and just to Weeks.

An analysis of the evidence shows that the contract was not based upon adequate consideration. Plaintiffs proved up their damages of approximately $81,000, by including items amounting to $50,000 for their own engineering and other services. It is doubtful that these services were worth any such amount. Their other expenditures, except their own counsel fees, were to be reimbursed by the corporation. They were obligated to pay into the corporation $100,000, for which they would receive stock and might have been called upon to buy additional preferred stock up to 9,000 shares. It is extremely unlikely that any additional capital would have been needed. It is highly probable that the business of the corporation would have consisted in granting licenses instead of manufacturing, owing to the necessity of adapting the fuel-saving device to

each engine to which it would be applied. There is no doubt that the inventions had a market value of over $1,000,000 at the time the contract was first discussed. The undisputed testimony in the record conclusively shows that Weeks had discovered something revolutionary as applied to internal combustion engines. The results testified to are no greater tax on credulity than were the initial inventions of the automobile and the aeroplane. Evidence is hardly necessary to show that the inventions had enormous value, and the testimony in the record that they were worth from $40,000,000 to $1,000,000,000 cannot be disregarded. The conclusion is inescapable that the consideration moving to Weeks for entering into the contract and transferring 49 per cent. interest of the inventions to plaintiffs was so grossly inadequate as to be unconscionable. In such case the inadequacy of the consideration would prevent the specific enforcement of the contract, regardless of whether actual fraud be shown. Marks v. Gates (C. C. A.) 154 F. 481, 14 L. R. A. (N. S.) 317, 12 Ann. Cas. 120, and authorities therein cited.

Furthermore, by the terms of the contract each part was dependent upon every other part. It is apparent that the services of Weeks were necessary to secure the allowance of patents for the existing inventions. Perhaps the plaintiffs believed Weeks to be a mechanical genius who had discovered a method of achieving that dream of scientists, perfect combustion. At any rate, there is no doubt they wanted his services to invent new and useful appliances. The clause providing for his personal services was an essential part of the contract. Equity will not enforce part of a contract unless it can be separated from the rest without changing the contract in any essential particular. A contract for personal services will not be enforced in equity by compelling the rendition of the services. Roller v. Weigle, 49 App. D. C. 102, 261 F. 251; Karrick v. Hannaman, 168 U. S. 328–336, 18 S. Ct. 135, 42 L. Ed. 484.

It is unnecessary to discuss other provisions of the contract. For the reasons above given we conclude that the bill was without equity and plaintiffs were not entitled to the decree rendered in either case. The judgment in each case will be reversed and the cause remanded, with instructions to set aside the sale of defendant's assets, to recall the rule for contempt, and to dismiss the bill without prejudice, and for such other orders and de-crees as may be just and equitable in the premises.

Reversed and remanded.

SIBLEY, District Judge (concurring specially).

I agree to the result reached, that the appellees should be left to another bill for rescission and accounting, or to an action at law for damages. The refusal of specific performance ought, I think, to be rested on the nature of the contract and the impossibility of a court of equity supervising its performance, rather than the inadequacy of consideration. The subject-matter of the contract was undeveloped inventions of undemonstrated value. I think the contract was not unconscionable, but reasonable.