**PALMER v. CHAMBERLIN et al.**

No. 13524.

United States Court of Appeals
Fifth Circuit.

Sept. 12, 1951.

J. Raburn Monroe, Alden W. Muller, New Orleans, La., for appellant.

R. Walston Chubb, St. Louis, Mo., Justin V. Wolff, New Orleans, La., for appellee.

Before HOLMES, BORAH, and RIVES, Circuit Judges.

RIVES, Circuit Judge.

This suit is for specific performance to require an executrix to surrender and transfer certificates of the common stock of the Graham Paper Company in accordance with a by-law of that company.

The by-law provides in substance that if any stockholder shall desire to sell any part of his common stock that for a period of sixty days after written notice of the stock-

holder's intention to sell the persons then composing the board of directors of the company shall have the right to buy, at a price determined according to a formula prescribed in said by-law, all or any part of said stock.

The formula for fixing the price at which the option is to be exercised is thus stated: " * * * at a price per share which shall be determined by dividing the aggregate net value of the assets of the company, as shown by its last preceding inventory, less the aggregate par value of outstanding preferred stock, together with or plus six per cent from the date of such inventory upon said net inventory value less the aggregate par value of said preferred stock, by the number of shares of the common capital stock of this company, and subtracting from such quotient the amount of dividends, if any, which may have been paid upon each share of stock since the date of such inventory; * * * "

The by-law further provides that the directors of the company shall hold the stock so purchased in trust for disposition, at the same price per share, among the persons and in the proportions directed by a resolution of the board of directors to be subsequently adopted.

The by-law further provides that if any stockholder shall die or cease to be connected with the company as a director, officer or employee, all of his common stock shall immediately become vested in the persons who at the time may be the directors of the company, and they shall hold the same in trust for disposition within sixty days, or if the holdings of the stockholder so deceased or retiring shall exceed 30% of the then outstanding common stock of the company, the directors shall have twelve months instead of sixty days within which to dispose of his stock. The stock is to be disposed of at a price to be determined according to the formula heretofore stated. So much of said stock as may not be purchased within said sixty days or twelve months, as the case may be, by the directors or persons permitted by their resolution to buy the same, shall immediately become the property of the personal representative of the deceased stockholder or revert to the retiring stockholder.

All of the stockholders joined in adopting and signing the original by-law in 1904. Its policy was then stated as follows: "It is for the common benefit of all the stockholders of this company that its stock should be owned only by those in its service as directors, officers or employees".

The by-law was amended several times until it reached its present form in 1912. Previous to 1912 the directors themselves were the only persons permitted to buy the stock. One effect of the 1912 amendment was to permit the directors to dispose of the stock to any person or persons.

Two main issues are presented on this appeal: first, whether the by-law and any contract based thereon are illegal or unenforceable; and second, whether the District Court erred in deciding the case upon the plaintiff's motion for summary judgment.

The charter of the company contains no provision authorizing restrictions on the transfer of shares. It is not, however, necessary that we determine the validity of the by-law strictly as a by-law adopted by persons holding only a majority of the common stock, for we may treat it as a contract entered into by all of the common stockholders.

Beginning in 1921 and continuing throughout his life, from time to time, and each time pursuant to the terms of said by-law, the decedent acquired by transfer fourteen certificates representing 2750 shares of the common stock of the company. In 1946 the stock of the company was split 10 for 1. All of the stockholders, including the decedent, turned in their certificates and received new certificates and at that time signed stubs for the new certificates which bore the printed language as follows: "Received Certificate No. * * * for * * * shares of Common Stock which, for a valuable consideration, the undersigned agrees with all other holders of common shares shall be held by him, his personal representatives and assigns, subject in every respect to the provisions

of the by-law of the Company as amended at the meeting of the stockholders held on October 22, 1912."

Each certificate, both old and new, carried on its face the words: "Issued subject to the agreement among the stockholders contained in the by-laws and summarized on the reverse hereof." On the back of each certificate the substance of the by-law was summarized. In part that summary read as follows: " * * * In the event of the death of the holder of any of said common shares, or in the event of the severance of his connection with Company as officer, director or employee thereof, all his said shares shall thereupon be subject to the right of purchase, within the time and at a price to be ascertained in the manner prescribed by the By-laws, to the members of the existing Board of Directors of the Company or by such other persons as the said Board of Directors may determine."

■ It is of course well settled that "A void by-law may become a valid contract". Blue Mountain Forest Association v. Borrowe, 71 N.H. 69, 51 A. 670,[1] 673.

■ As is conceded, the validity of the by-law as such would be governed by the law of Missouri, the state of incorporation. Restatement Conflict of Laws, Sec. 182; 20 C.J.S., Corporations, § 1802. Appellant contends, however, that its validity when considered as a contract should be tested by the law of Louisiana where appellant claims that the decedent purchased his stock. See Restatement of the Conflict of Laws, Secs. 311, 312, 313 et seq. None of the counsel have cited any Louisiana decisions directly in point on the validity of the contract.[2] Appellant claims that under the law of that state it would be void for lack of mutuality

and as containing what is referred to in Louisiana law as potestative conditions, and cites the following authorities: Louisiana Civil Code Articles 2024 and 2034; Blanchard v. Haber, 166 La. 1014, 118 So. 117; Cloverland Dairy Products Co., Inc., v. Grace, 180 La. 694, 157 So. 393; Avery v. International Trade Exhibition, 163 La. 454, 112 So. 44. We do not pass upon that contention, for we think that the validity of the by-law even as a contract is governed by the law of the State of Missouri.

■ In diversity of citizenship cases, the federal courts, when deciding questions of conflict of laws, must follow the rules prevailing in the states in which they sit. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477; Cockburn v. O'Meara, 5 Cir., 141 F.2d 779.

■ Louisiana recognizes the rule that a contract made in that state may be made with reference to the law of some other state. 2 Beale Conflict of Laws 1139, Sec. 332.26 and cases there cited; Whiston v. Stodder, 8 Mart., O.S., La., 95, 13 Am.Dec. 281; McKane v. New Amsterdam Casualty Co., La.App., 199 So. 175, 182. In the last mentioned case the Court said: " * * If, after investigation, it appears that the parties have indicated, either expressly or tacitly, that their rights and obligations should be governed by the laws of the place of performance then the court should not hesitate to apply that law to the case."

■ That rule was well expressed by Judge Sibley speaking for this Court in a case coming from Texas: " * * * Parties in contracting may adopt as part of their contract the laws of a state other than their own if not contrary to the law or public policy of the state where the contract is made and to be performed. Mutual Life

---

1. For cases applying that principle to stock transfer restrictions see: Searles v. Bar Harbor Banking & Trust Co., 1929, 128 Me. 34, 145 A. 391, 65 A.L.R. 1154; Blue Mountain Forest Association v. Borrowe, supra; Vannucci v. Pedrini, 1932, 217 Cal. 138, 17 P.2d 706; Doss v. Yingling, 1930, 95 Ind.App. 494, 172 N.E. 801; Model Clothing House v. Dickinson, 1920, 146 Minn. 367, 178 N.W. 957; Garrett v. Phila. Lawn Mower Co., 1909, 39 Pa.Super. 78; New England

Trust Co. v. Abbott, 1894, 162 Mass. 148, 38 N.E. 432, 27 L.R.A. 271; Prindiville v. Johnson & Higgins, Ch.1921, 92 N.J.Eq. 515, 113 A. 915; Brown v. Little, Brown & Co., 1929, 269 Mass. 102, 168 N.E. 521, 66 A.L.R. 1284.

2. The case of Martin v. McCloskey, 155 La. 604, 99 So. 477, recognized an obligation which bound the plaintiff not to sell stock without first offering it to the company at par.

Ins. Co. v. Hill, 193 U.S. 551, 24 S.Ct. 538, 48 L.Ed. 788. * * * " Connecticut General Life Ins. Co. v. Boseman, 5 Cir., 84 F.2d 701, 705; See also Clark v. Gibbs, 5 Cir., 69 F.2d 364, 365; Duskin v. Pa. Central Airlines Corporation, 6 Cir., 167 F.2d 727; Annotation 112 A.L.R. 124.

The things to be done under the contract centered in Missouri. The contract took the form of a by-law of a Missouri corporation. That by-law was unanimously agreed to or ratified by all of the stockholders, one hundred fifty-one in number. The agreement of each stockholder to be bound by the terms of the by-law was a material consideration for a like agreement on the part of each other stockholder. The one-hundred fifty-one stockholders resided in various states. It was not intended that the validity and effect of the agreement should vary according to the laws of many different states, but rather that each stockholder should be alike bound. All these considerations clearly point to the intention of the stockholders that the validity and effect of the by-law either as such or as a contract should be governed by the law of the State of Missouri.

We need not go further back into the law of Missouri than 1946 when the stockholders renewed their contract. If not already bound, Palmer then became bound by the terms of the by-law, in consideration of a like agreement on the part of the other stockholders. In fact Palmer availed himself of that consideration on June 4, 1948, when he purchased an additional 250 shares of stock.[3]

In the case of State at Inf. of Huffman v. Sho-Me Power Co-operative, 356 Mo. 832, 204 S.W.2d 276, 280, decided by the Missouri Supreme Court in 1947, the Court said: "It is clear that under present statutes a business corporation can place some restriction on the transfer of its shares if such restriction is authorized by the charter and stated on the stock certificate. It cannot completely restrain a transfer, but

we cannot hold that retention of an option by the corporation to purchase within a reasonable time is void. *. * * "

The validity of a restriction which precludes a shareholder from transferring his shares without first giving the company, or the other shareholders, an option to purchase within a limited time has often been sustained. The cases are collected in an excellent article on "Stock Transfer Restrictions and the Closed Corporation" by Bernard F. Cataldo in the February 1951 issue of the Virginia Law Review (37 Va. Law Review 229). Mr. Cataldo states that he has been able to find only one case wherein the court was of the opinion that such a restriction was invalid as being an unreasonable restraint on alienation. That is the case of Bloede Co. v. Bloede, 1896, 84 Md. 129, 34 A. 1127, 33 L.R.A. 107. Among cases sustaining such restrictions may be cited the following: New England Trust Co. v. Abbott, 1894, 162 Mass. 148, 38 N.E. 432, 27 L.R.A. 271; Searles v. Bar Harbor Banking & Trust Co., 1929, 128 Me. 34, 145 A. 391, 65 A.L.R. 1154; Blue Mountain Forest Association v. Borrowe, supra; Vannucci v. Pedrini, 1932, 217 Cal. 138, 17 P.2d 706; Bessette v. St. Albans Co-operative Creamery, Inc., 1935, 107 Vt. 103, 176 A. 307; Cowles v. Cowles Realty Co., 1922, 201 App.Div. 460, 194 N.Y.S. 546; Monotype Composition Co. v. Kiernan, 1946, 319 Mass. 456, 66 N.E.2d 565; Baumohl v. Goldstein, N.J.Ch., 1924, 95 N.J.Eq. 597, 124 A. 118; Doss v. Yingling, 1930, 95 Ind.App. 494, 172 N.E. 801; Nicholson v. Franklin Brewing Co., 1910, 82 Ohio St. 94, 91 N.E. 991; Sterling Loan & Investment Co. v. Litel, 1924, 75 Colo. 34, 223 P. 753; Weiland v. Hogan, 1913, 177 Mich. 626, 143 N.W. 599; Lawson v. Household Finance Corp., 1929, 17 Del.Ch. 1, 147 A. 312, affirmed 1930, 17 Del.Ch. 343, 152 A. 723; Casper v. Kalt-Zimmers Mfg. Co., 159 Wis. 517, 149 N.W. 754, rehearing denied 1915, 159 Wis. 517, 150 N.W. 1101; Bloomingdale v. Bloomingdale, Sup.1919, 107 Misc. 646, 177 N.Y.

3. Thirteen of the stock certificates held by decedent at the time of his death were dated as issued by the company on October 10, 1946 and the fourteenth such certificate on June 4, 1948.

S. 873; Moses v. Soule, Sup.1909, 63 Misc. 203, 209, 118 N.Y.S. 410, 414, affirmed 136 App.Div. 904, 120 N.Y.S. 1136.

The underlying reason for such restrictions was stated by Justice Holmes when Chief Justice of the Supreme Judicial Court of Massachusetts: "Stock in a corporation is not merely property. It also creates a personal relation analagous otherwise than technically to a partnership. * * * there seems to be no greater objection to retaining the right of choosing one's associates in a corporation than in a firm." Barrett v. King, 181 Mass. 476, 479, 63 N.E. 934, 935.

The appellant insists upon a further contention that the restriction scheme as embodied in the by-law should be declared illegal and unenforceable in that it places the directors of the corporation in a position which is inconsistent with their fiduciary duties as directors of the corporation. The circumstances under which seven of the directors agreed to purchase the stock here involved are set forth in an affidavit of the President of the company as follows: "Deponent further states that in connection with the tender of $91,025 to the Estate of Edwin M. Palmer, deceased, deponent had tentatively allocated the said stock, when acquired, to certain employees of the Company, twenty-two in number, other than the purchasers thereof, not including any member of the Board of Directors, but was thereupon advised by counsel for the Company that the By-Laws required actual purchase of the same by firm contract or agreement, and having intimations that the said estate would not deliver said stock, deponent requested the purchasers of the stock named in the Petition to agree to purchase the same for later distribution, notwithstanding said contemplated delays in delivery, and at the time of the agreement of purchase of said stock by said purchasers, they agreed, at any time within one year from the date of delivery, to offer the stock at the price determined under the By-Laws at that time, as the Board of Directors should so determine, or, in the alternative, agreed to transfer the stock to employees designated by the President at the same price paid in purchasing the same from the Palmer estate. * * *"

The agreement of the purchasers in that regard was written and executed on the same date as the resolution of the Board of Directors designating them as purchasers.

It is said however that it is not necessary to impugn the motives of the directors, that the validity of the contract is to be tested not only by what the directors did, but by what they might have done. No doubt the directors had the power under the by-law to designate one or more of their own number as the purchaser or purchasers of the stock. That discretion was vested in them by the stockholders, acting voluntarily and advisedly through resolution unanimously agreed to and repeatedly amended, which had continued the plan in operation for forty-four years up to the time of Palmer's death.

So long as only the interests of the contracting parties are involved, it is hard to see why limits should be set to the confidence which they may repose in one or more of their number, nor why they should be forbidden to vest in such one or more a discretion, the exercise of which might involve a temptation to favor himself or themselves. "It is unquestionably true that the officers and directors of a corporation are, in a sense, trustees". Grand Amusement Co. v. Palladium Amusement Co., 315 Mo. 905, 287 S.W. 438, 441. See also 3 Fletcher Cyclopedia Corporations, Secs. 838 et seq.; Securities and Exchange Commission v. Chenery Corp., 318 U.S. 80, 85, 63 S.Ct. 454, 87 L.Ed. 626.

Likewise, "An agent is a fiduciary with respect to the matters within the scope of his agency." 2 Am.Juris. Agency Sec. 252, citing inter alia Sim v. Edenborn, 242 U.S. 131, 37 S.Ct. 36, 61 L.Ed. 199; Grumley v. Webb, 44 Mo. 444, 100 Am.Dec. 304, and Amer. Law Institute Restatement Agency Sec. 13. Nevertheless, "While an agent cannot, without his principal's consent, act as the agent of another person in a matter in which the two principals' interests conflict, two parties may always, by mutual consent, no

matter how diverse their interests may be, make a third party their common agent. This is plain common sense and the everyday practice. * * *" 2 Amer.Juris. Agency Sec. 266; See Restatement Agency, Sec. 392. So also when an agent buys directly from his principal, "If the agent makes a full disclosure of all the material facts and the sale is free from fraud, the transaction will be sustained. * * *" 2 Amer.Juris.Agency Sec. 261; See 3 C.J.S., Agency, § 145; Restatement Agency, Secs. 24, 389, 390, 392. The principle was well stated by the Court of Appeals for the Seventh Circuit:

"* * * when the court is asked to declare a contract void upon the ground that it conflicts with the public policy, to justify sustaining the defense, the line of that policy must be clear and distinct. Bank of Augusta v. Earle, 13 Pet. 519, 597, 10 L. Ed. 274. This is upon the reasoning that men shall have the utmost liberty of contracting and that their agreements, when entered into fairly and voluntarily, shall be held sacred and enforced by the courts. This freedom of contract is not to be lightly interfered with. The burden of showing illegality is upon the party asserting it and it is not sufficient merely to create confusion and suggest doubts as to its legality. Illinois Surety Co. v. O'Brien, 6 Cir., 223 F. 933.

"It is well recognized that one employed as agent violates no duty to his principal by acting for another party to the transaction if he makes full disclosure of all relevant facts which the principal knows or should know, or if the principal otherwise knows of them and acquiesces in the agent's conduct. Restatement, Agency, Sections 390, 391 and 392; Williston on Contracts, Revised Edition, Vol. 5, section 1532 and cases there cited. * * *" United States v. Grace Evangelical Church of South Providence Ridge, 132 F.2d 460, 462.

It is said that the case which was relied upon by the draftsman of the original by-law in 1904 was New England Trust Co. v. Abbott, 1894, 162 Mass. 148, 38 N.E. 432, 434, 27 L.R.A. 271. In that case the by-law went so far as to permit the directors of the corporation to appraise the value of the deceased stockholder's stock and to determine its price. The Court said: "It is settled that one may agree to sell his property at a price to be determined by another, and that he will be bound by the price so fixed, even though the party establishing it was interested; provided the interest was known, and no objection made by the parties, and no fraud or bad faith is shown."

Unjust enrichment of the directors through the operation of this by-law would be not only unethical but also short sighted business. Most directors before becoming such already own considerable amounts of stock. What is best for the company is then best for them. A long range profit motive would encourage rather than oppose fidelity to their trust and hence a fair distribution of stock among the employees The history of our Country proves that American business men, in the operation of their own businesses, may usually be relied upon to make decisions at least as statesmanlike as those that might be reached upon such matters by law trained judges.

We hold that, under the circumstances of this case, the by-law contract is not void upon the ground that it places the directors in a position inconsistent with their fiduciary duties.

The appellant does not contend that the directors failed to comply with the terms of the by-law, nor that the price offered for the stock was not correctly determined according to the by-law formula.

Coming then to the second main issue presented on this appeal: Did the district court err in deciding this case upon the plaintiffs' motion for summary judgment?

Rule 56, Federal Rules of Civil Procedure, subparagraph (c), 28 U.S.C.A., reads as follows: "The judgment sought shall be rendered forthwith if the *pleadings, depositions, and admissions on file, together with the affidavits,* if any, *show* that there is *no genuine issue as to any material fact* and that the moving party is *entitled to a judgment as a matter of law."* (Emphasis supplied.)

The appellant contends that whether a restriction is an unreasonable restraint on alienation or trade is a question of fact

to be determined by a jury in jury cases, but with this contention we do not agree. There being no dispute about the terms of the written agreement, its validity as being in undue restraint of trade or alienation is a question of law for the Court. True that question does involve a consideration of all of the surrounding facts and circumstances. Further, it is to be decided not merely by what has been done under the contract, but by what may be done under it, 36 Amer.Juris. p. 485, Monopolies, etc., Sec. 5; United States v. Trenton Potteries Co., 273 U.S. 392, 401, 47 S.Ct. 377, 71 L.Ed. 700. It is none the less a question of law for the Court to determine whether a restraint imposed by written agreement is reasonable. 17 C.J.S. Contracts § 615, p. 1278; 36 Amer.Juris. p. 532, Monopolies, etc., Sec. 51. See the full and able discussion of this rule in Hood v. Legg, 160 Ga. 620, 128 S.E. 891, and Stark County Milk Producers' Ass'n v. Tabeling, 129 Ohio St. 159, 194 N.E. 16, 20, 98 A.L.R. 1393.

In the last mentioned case the Court said: "* * * there was no dispute in this case as to the terms of the contract itself. The only disputed questions of fact related to incidental matters growing out of the operation and enforcement of the contract." That is true in the case at bar.

■ Ordinarily where no facts are in dispute and only questions of law are involved, the case is "ripe for a summary judgment". Bartle v. Travelers Ins. Co., 5 Cir., 171 F.2d 469, 471; 3 Barron & Holtzoff Federal Practice and Procedure, Sec. 1234, note 56, p. 72.

■ As said by Professor Moore, "The existence of an important, difficult, or complicated question of law, where there is no issue as to the facts, is not a bar to a summary judgment." 3 Moore's Federal Practice (1938 Edition) p. 3185, Sec. 56.04.

■ However, before rendering judgment the Court must be satisfied not only that there is no issue as to any material fact, but also that the moving party is

entitled to a judgment as a matter of law. Where, as in this case, the decision of a question of law by the Court depends upon an inquiry into the surrounding facts and circumstances, the Court should refuse to grant a motion for a summary judgment until the facts and circumstances have been sufficiently developed to enable the Court to be reasonably certain that it is making a correct determination of the question of law. In the case at bar that had been done,[4] and we have no doubt that the Court correctly determined that the contract was valid.

■ It does not necessarily follow that the contract should be enforced by specific performance. As said by the Supreme Court in Pope Mfg. Co. v. Gormully, 144 U.S. 224, 236, 12 S.Ct. 632, 637, 36 L.Ed. 414: "* * * To stay the arm of a court of equity from enforcing a contract it is by no means necessary to prove that it is invalid; from time immemorial it has been the recognized duty of such courts to exercise a discretion; to refuse their aid in the enforcement of unconscionable, oppressive, or iniquitous contracts; and to turn the party claiming the benefit of such contract over to a court of law. * * *" See also Marks v. Gates, 9 Cir., 154 F. 481, 14 L.R.A.,N.S., 317.

■ Gross inadequacy of consideration will prevent specific performance of a contract. Weeks v. Pratt, 5 Cir., 43 F.2d 53, 57.

Let us briefly consider each of the issues which the appellant in her brief claims remain to be tried: (1) "The price offered by the plaintiffs for the stock calculated according to the by-law formula is only a fraction of the true value of the stock."

The stock of the Company not being sold on the open market, it would be difficult to arrive at its true value. Appellant insists that, based upon the Company's record of earnings, the stock has a much greater value than the price at which the appellees propose to purchase it. The cost of the stock to Palmer is admitted at the sum of $44,303.91, while the purchase price

---

4. The proceedings considered by the District Court on the motion for summary judgment comprise 385 printed pages of the transcript.

tendered by the appellees under the by-law was more than twice that cost, or $91,-025.00. As late as June 4, 1948, about six months before his death, Palmer purchased 250 shares at $29.23 per share as against $33.10 per share tendered by the appellees. A restriction fixing the price at book value has been sustained. Doss v. Yingling, supra. In New England Trust Co. v. Abbott, supra, the Court said: " * * * specific performance of an agreement to convey will not be refused merely because the price is inadequate or excessive. The difference must be so great as to lead to a reasonable conclusion of fraud, mistake, or concealment in the nature of fraud, and to render it plainly inequitable and against conscience that the contract should be enforced."

The formula upon which the appellant is asked to sell is the same formula upon which her decedent was on fourteen separate occasions permitted to buy. In a somewhat similar situation in Prindiville v. Johnson & Higgins, 92 N.J.Eq. 515, 520, 113 A. 915, 918, the Court said: "The charter restriction of which he complains forms the very keystone of the corporate scheme and structure he helped build, and under which he holds, and he cannot be heard to obliterate it. He has supped sumptuously at the table of plenty for eight years, and he cannot bring the feast to an end simply because he is indisposed."

■ The record affirmatively shows that the price offered is not so small in relation to the true value as to make the contract oppressive or unconscionable.

While the appellant may not be in position to attack as unconscionable the contract by which her decedent has profited, we shall briefly refer to the other claimed issues of fact: (2) "That this true value of this stock was in large part created by efforts and work of the decedent."

■ Faithful performance of Palmer's duties as an employee and as manager of the Company's New Orleans branch would of course enhance the value of the stock, but that would not excuse his estate from carrying out the contract into which he had entered. Hence this is not a material issue. (3) "That the by-law and the alleged agreement among stockholders constitute an intentional scheme, deliberately confected by the directors of the Graham Paper Company, to circumvent and evade the law of Missouri."

■ The record affirmatively shows that the directors did not originate the plan but that the terms of the by-law had been unanimously agreed upon by the stockholders on more than one occasion, the last one being as late as 1946. At that time the law of Missouri and the charter of the company permitted the company to purchase its own stock and the law of Missouri was not contrary to the substance of this by-law.

(4) "That the by-law was calculated to permit the directors to, and they repeatedly have, used it to further their own individual selfish interests, at the expense of the other stockholders and of the Company."

(5) "That the by-law is an intentional scheme of the directors and officers to perpetuate themselves in office, which they have done, regardless of merit."

(6) "That, in actual operation, the directors have abused their trust by attempting rigidly to enforce the severe terms of the by-law, involving as it does a sacrifice of value, in the case of less favored employees, and by either waiving the by-law or making special favorable arrangements in the case of officers, department heads, and other favored persons."

No facts are alleged in the affidavit of the appellant filed in opposition to the motion for summary judgment showing or tending to show that the directors have used the by-law to further their individual selfish interests at the expense of the other stockholders and of the Company. It is uncontroverted that the directors and officers have not in fact held a majority of the common stock of the Company since 1923 and that they have held only about one third of the common stock since as far back as 1926.

Whether the directors should exercise the option vested in them by the terms of the by-law is a question primarily for the directors to decide. They might decide differently on different occasions without be-

ing guilty of an abuse of trust. The record shows without any conflict, as expressed in one of the affidavits, that: "* * * with the exception of stock of Edwin M. Palmer, deceased, all of the common stock of Graham Paper Company, now consisting of 150,000 shares outstanding of the par value of $10 per share, was owned and held at the time of the filing of the Complaint herein by 151 persons, all of whom were employees, officers or Directors of plaintiff corporation, with the exception of one individual who owns 2,000 shares of said common stock heretofore tendered to the persons constituting the Board of Directors of the Company on or about June 1, 1933; on that occasion (in the depth of depression) the persons constituting the Board of Directors determined not to purchase the stock under the terms of the By-Laws of the Company * * *".

The stockholders retained control of the election of the directors, and if any director should prove unfaithful to his trust that would seem to call for his replacement rather than for an abandonment of the trust agreement. The affidavits together with the documentary evidence show that in purchasing the stock of the decedent, the directors have not breached their fiduciary duties, but have merely acted to carry out the by-law agreement.

The appellant further insists that the terms of the by-law are against the best interests of the Company and unfair to its stockholders. Those are matters for the parties to decide for themselves. "* * * it is a matter of great public concern that freedom of contract be not lightly interfered with." Steele v. Drummond, 275 U.S. 199, 205, 48 S.Ct. 53, 54, 72 L.Ed. 238; see United States v. Grace Evangelical Church, 7 Cir., 132 F.2d 460; Diamond Match Co. v. Roeber, 106 N.Y. 473, 13 N.E. 419, 422; 6 Corbin on Contracts 460; Cardozo, Nature of Judicial Process, p. 67.

What is best for their own business may safely be left to the stockholders. Obviously the Company has prospered or else appellant would not insist on remaining a stockholder when the opportunity is afforded to dispose of her stock at over twice its cost. Of course, it is possible that the success of the Company has been in spite of rather than because of the by-law, but it is more probable that keeping the stock in the hands of those in the service of the Company has proved a wise policy. In any event, that question is not for the Court, but for the parties to decide, unless there be such gross unfairness as to call for denial of the remedy of specific performance, and that we do not find.

We conclude that the contract imposing restrictions on the transfer of shares is valid and enforceable and that there remains no genuine issue as to any material fact.

The decree is therefore affirmed.

HOLMES, Circuit Judge (dissenting).

The majority opinion does not hold that the by-law is valid, but proceeds upon the thesis that a void by-law may become a valid contract. The opinion concedes that the charter of the company contains no provision authorizing restrictions on the transfer of shares; it predicates its decision upon the substance of a void by-law referred to on the face, and summarized on the back, of each stock certificate, which the court holds to be a valid contract.

The affirmative of several genuine issues presented by the pleadings is that the price offered appellant for her stock is only a fraction of its true value; that the by-law and alleged contract were wilfully devised by the directors to evade the laws of Missouri; that the by-law was intended to permit the directors to further their own selfish ends at the expense of the other stockholders, and that they repeatedly used it for such purpose; that the by-law was an intentional scheme of the officers and directors to perpetuate themselves in office, which they have done regardless of merit; and that, under the by-law, the directors have abused their trust by enforcing it rigidly as to some employees, with confiscatory results, while waiving its provisions or making special arrangements as to others, who were favored by department heads.

Not only did the charter of the Graham Paper Company give it no authority to

adopt such a by-law, but the general corporation law of Missouri requires that restrictions on the transfer of stock must be reasonable. The by-law is not only alleged to be unfair, unreasonable, and against public policy, but to have been affected with bias, prejudice, and partiality, in its administration. I think it violates the fundamental principle that no one should be permitted to declare the law for himself *(nemo jus sibi dicere potest)*. Also, it renders every employee and shareholder subject to the whim, caprice, or favoritism, of the directors: and facts are pleaded which justify the inference that, in operation, the by-law is unfair to some, prejudicial to others, and contrary to the best interest of the corporation.

By keeping all of the outstanding stock in the hands of friendly employees, subject to dismissal, the members of the Board are enabled to discriminate in their own favor in the matter of paying bonuses. For example, in the years 1941, 1942, 1943, 1944, and 1945, they voted to all of the officers, consisting of five of their number, bonuses of 30% of their salaries. These salaries, even without bonuses, were higher than those of other employees. For the same period, they fixed bonuses for other classifications as follows: Sales managers, 25%; branch managers, 20%; department managers, 20%; salesmen, 15%; clerical employees, 10%. Then follows a complicated scale of bonuses, for warehouse and delivery employees, at 5%, to be computed by taking 6% of actual compensation earned during five months ending November 30th. Exactly what this means, I do not know, but it is followed by this sentence, which is easy to understand: "Variations in the basis of this resolution in special cases may be made at the discretion of the president." Next comes the resolution for 30% additional compensation to the officers of the company for services rendered during the last half of 1945, amounting to $2880 for the president; $2700 for the executive vice-president; $2520 for the vice-president; $2520 for the secretary and treasurer.

The resolution closes with the following clarifying sentence: "The above amounts are voted separately, each officer, however, not voting upon the motion fixing the additional compensation paid to himself." Similar resolutions were passed for each of the above mentioned years, with a slight variation for 1941. Thus loyalty in an employee to the personnel of the management becomes more important than efficient operation. This is not only true as to bonuses but as to the distribution of stock that may be confiscated in part under the by-law at a fraction of its real value. Thus we find the President of the company writing to one who had made a constructive suggestion with reference to some additional stock purchases, saying: "In this connection, I would be less than fair if I did not tell you that in considering the merits of any individual the stock is connected with, the attributes of loyalty and organization team work are given great weight." It is apparent that, under the alleged agreement, there is a windfall in stock values to be taken from the appellant and given to someone. The recipients of this unjust enrichment are to be determined by the directors of the corporation. Preferential treatment of loyal employees is permissible, or all of it may be awarded separately to the directors themselves. This may happen not only when a faithful employee dies, but when one is discharged simply because of his disagreement with policies of the management. Upon such discharge, the by-law restriction, if valid, would permit the directors to see that such dissenter's stock is placed in more pliable hands, or in the hands of the directors individually. Thus all criticism, whether constructive or not, may be effectively silenced. A number of examples are given in the record to illustrate the discriminatory manner in which the by-law has operated against some, while favored insiders were given special dispensations. Thirteen such instances are alleged by the appellant; in reply, the appellee undertakes to explain and justify each one; a judge, jury, or other fact-finding tribunal, might draw different inferences from the undisputed facts relevant to this issue, but the summary judgment procedure has denied appellant a trial thereof on the merits.

Since the majority opinion proceeds upon the hypothesis that a void by-law may become a valid contract, we are justified in saying, as to some of the stock, that this is an action in a federal court, sitting in Louisiana, for the specific performance of a contract, made in Louisiana, for the sale of stock to be delivered in Louisiana. This is true since some of the stock certificates were delivered in Louisiana, and their stubs were signed by Palmer in New Orleans, all of which the appellant offered to prove on the trial of the case on the merits. Under the Louisiana law, the alleged agreement would be void for lack of mutuality and as containing potestative conditions. Civil Code, Articles 2024 and 2034; Avery v. International Trade Exhibition, 163 La. 454, 112 So. 44; Blanchard v. Haber, 166 La. 1014, 118 So. 117; Cloverland Dairy Products Co., Inc.; v. Grace, 180 La. 694, 157 So. 393. If a man signs a written contract, for a valuable consideration, he is bound by it, in the absence of fraud or other illegality; but, if he signs a purported receipt, he is not always bound by a contractual provision printed thereon, and is never so bound unless there is a valid consideration for the contract. This is well illustrated by a recent decision of this court. Royal Route Coal Co. v. Burch, 5 Cir., 182 F.2d 658.

It is not necessary to impugn the motives of the directors; they may be personally innocent; it is the scheme that makes them ruthless; that offends public policy; and permits them to profit by the death of their fellow, though they have no insurable interest in his life. The scheme must be tested for reasonableness, not only by what the directors did, but by what they may do, or might have done. In purchasing stock from shareholders pursuant to the by-law, and acquiring it in their individual capacity, as they frequently did or might have done, and apparently did in this case, the directors would be in the position of violating their fiduciary relationship through the device of the by-law agreement. See Ballantine on Private Corporations, p. 397.

He who seeks equity must do equity, and it is not equity to require specific performance of an agreement to sell for a fraction of the value of the property involved. The right of alienation is an incident of property that should not be surreptitiously restrained by corporate management. The incentive of employees would be impaired if they understood that they were not absolute owners of the shares in their names. The good relations of directors would be marred if each should be deemed the quasi-heir presumptive of the others. Corporate stock may be worth many times its book value, due to good will, patent rights, other hidden assets, earning power, and many other things; but all that needs to be decided here is that the device is unfair and unreasonable. In this view the case is simple, and the decision in accord with justice under the laws of either Louisiana or Missouri: but, if we undertake to make a valid contract out of a void by-law, we become entangled in the conflict of laws of two states; the public policy of each, the duties of directors as fiduciaries, their rights as individuals to purchase shares that they claim to hold in trust; and their capacity to sue or be sued under Rule 17(a) and (b) of the Federal Rules of Civil Procedure.

Here we have an instance of the summary judgment procedure being as arduous as a trial on the merits. The pertinent provisions of the by-law or so-called agreement cover less than a printed page; but the record contains four hundred and seven printed pages, not to mention the briefs. Notwithstanding the complaint, exhibits, answer, request for admission of facts, reply thereto, depositions, affidavits, stipulation following pretrial conference, and motion for summary judgment, with exhibits, we remain in doubt as to which of the appellees are the real parties plaintiff. Sec. 2 of the by-law (or the alleged agreement) provides, *inter alia,* that, if any stockholder shall die, all of the common stock owned by him at the time of his death shall immediately become vested in the directors of the company, who shall hold the same in trust for such disposition within sixty days after notice or knowledge of the death of such stockholder as the Board of Directors may determine; and so much of said stock

as may not be purchased within sixty days by the directors, or persons permitted by their resolution to buy the same, shall immediately become the property of the personal representative of the deceased stockholder. Effective compliance by any of the appellees with either the by-law or so-called agreement is problematical.

This suit is not in the name of the directors of the corporation, as trustees, in whom the by-law says the stock shall immediately become vested upon the death of the stockholder; neither is it in the name of the directors individually, because two of the directors who are named as plaintiffs were not designated by the Board as individuals who have agreed to purchase the 2750 shares of stock. The court is entitled to know in what capacity the plaintiffs are suing. Rule 17(a) provides that every action shall be brought in the name of the real party in interest, but that a trustee of an express trust (which the directors claim to be) may sue in his own name. The capacity of the plaintiffs to sue may be determined by the laws of different states, which is dependent upon whether they are suing as individuals or in a representative capacity. If the directors are suing as individuals, their capacity to sue is determined by the law of their domicile, which is Missouri; but if they are suing as trustees, their capacity is determined by the law of Louisiana, which is the State of the forum. See Rule 17(b) of the Federal Rules of Civil Procedure. Since this case is reduced to a suit for the specific performance of a contract between the seller and the purchasers, it is well to inquire who are the real parties plaintiff, and whether they complied with the obligations upon them under the alleged contract.

In notifying Mrs. Palmer, the executrix, that the above mentioned stock had been purchased from her husband, and the price that the directors were willing to pay for it, the Treasurer of the corporation wrote: "In order to clear this matter, we will require a certified copy of letters testamentary, copy of court order of sale, and there is an added requirement imposed upon states of non-resident decedent stockholders of Missouri corporations of obtaining a waiver from the State of Missouri. For this purpose the form for Transfer and Inheritance Tax, Consent to Transfer or Deliver Assets, can be obtained from the Office of Director of Revenue, Jefferson City, Missouri."

According to appellees' contention, this letter was directed to one of the beneficiaries of an express trust by the Treasurer of a corporation, whose directors were the trustees and whose duty was to be faithful to the interest of said beneficiary, as well as to the interest of the prospective purchasers. In this letter, appellant was told that the stock of the late Mr. Palmer had been purchased, but not by whom, and that the Board of Directors had authorized the writer "to settle" for said 2750 shares for a total of $90,062.50. At another time, she was advised that the amount had been recomputed and raised to $91,025.00; on the same day she was served with a process verbal of tender. The president not being ready to recommend anyone to purchase the stock, other than the directors themselves, the Board designated themselves as the persons entitled to purchase the same, and (as alleged) seven of their number, individually, did purchase the 2750 shares standing on the books in the name of Edwin M. Palmer, Sr., deceased. Thus the directors, as trustees, sold to themselves individually the stock which they claim became vested in them, in trust, upon the death of the deceased, the price being about one thousand dollars above what was first offered Mrs. Palmer, which shows that the price-fixing formula is an elastic one.

According to the contention of the appellees, immediately upon the death of Palmer his stock vested in the directors in trust; but they disregarded the fact that the appellant was one of the beneficiaries of the trust, with a contingent reversionary interest in the *res*. The other beneficiaries were the prospective purchasers, who were to be designated by the directors, not by the president; and the trustees' duty was to act impartially between all beneficiaries; and, if no purchasers were duly designated within said sixty days, the stock was immediately to become the property of the

estate of the deceased stockholder, which it was the duty of the directors, as trustees, so to declare. Instead of doing this, the directors declared themselves entitled as individuals to purchase said stock, and are suing in their own name for specific performance of the alleged contract. When trust officers and directors overstep the line between duty and self-interest, they cannot come into court with clean hands, and are not entitled to specific performance in any view of the case. Even if the by-law were valid, and the directors acquired the stock in trust, with the power and duty to designate the purchasers within sixty days, they were estopped to designate themselves, and their effort to do so, at a price decreed by themselves, was a nullity. No one else having been designated within the required period, the stock immediately became the property of the personal representative of the deceased stockholder.

Nothing is better settled than the duty of a trustee not to deal with trust property for his own advantage, and not to sell trust property to himself nor to buy from himself. Vol. 4, Pomeroy's Equity Jurisprudence (5th Edition), Sections 1075 and 1078, pp. 217 and 226. A by-law that sanctions the violation of this principle is against public policy. I think the judgment appealed from should be reversed.